BYRON E. KNIGHT v. WESTERN AUTO SUPPLY COMPANY, A CORPORATION, WILLIAM R. COTTON AND A. J. EARL.—193 S. W. (2d) 771.

Kansas City Court of Appeals. April 1, 1946.

*Clay C. Rogers, John A. McGuire* and *Mosman, Rogers, Bell & Conrad* for appellant, Western Auto Supply Company.

*McAllister & Humphrey,* and *Joe W. McQueen,* for appellant, William R. Cotton.

*Richard H. Beeson, David P. Dabbs,* and *Raymond E. Martin* for appellant, A. J. Earl.

646

*J. M. Loomis* for respondent.

BLAND, P. J.,—This is an action for damages for an assault and battery. There was a verdict and judgment in favor of plaintiff in the sum of $1500 actual damages and $1500 punitive damages. Defendants have appealed.

The evidence shows that the defendant, the Western Auto Supply Company (hereinafter called the company) maintains at various places throughout the country what are called associate stores, which are supplied from the Company's warehouses and operated under contracts or franchises issued by the Company through its warehouse department. Defendant Cotton was the manager of the Company's warehouse located at 2114 Central Street in Kansas City, Missouri. As such manager, he would pass upon and approve or disapprove applications of parties desiring to operate an associate store. Prior to November 25, 1939, plaintiff and his sister-in-law, Mrs. Joyce K. Todd, had operated as partners an associate store in Harlan, Iowa. Early in November, 1939, Mrs. Todd bought the interest of plaintiff in said store and had placed one Frank Caporal in charge to operate it for her. Plaintiff stated that the sale of his interest to Mrs. Todd was subject to an option or understanding of some character not made plain by the evidence, but it appears from plaintiff's testimony that he and Mrs. Todd drew up a written agreement whereby plaintiff was to acquire Mrs. Todd's interest in the store. The agreement was not signed and could not become effective unless approved by the Company.

Plaintiff's testimony is to the effect that on the 25th of November, 1939, he, his wife, and daughter drove from Harlan, Iowa, to Trenton, Missouri, where he picked up Mrs. Todd and from there they proceeded to drive to Kansas City for the purpose of obtaining approval of the agreement between the parties. They arrived at the warehouse above described and met defendant Cotton. At that time defendant Earl was present and was introduced to the plaintiff. Earl was an independent plumber operating on his own account, and had been accus-

tomed to make repairs for the Company. He had been called this day to repair a leak in the toilet or washroom, and he and the plaintiff had never met before. When plaintiff and his party arrived at the warehouse there were present in addition to Mr. Cotton a number of other employees, among them a Mr. Bisbee whom plaintiff knew, and who had assisted in installing the store at Harlan, Iowa. There was a large outer office in the front of the building occupied by a number of clerks and others, and back of this was Mr. Cotton's private office to which place plaintiff and his party retired with Mr. Cotton for consultation. Plaintiff testified: "I told Mr. Cotton that we had driven from Harlan, Iowa, with the hopes of having a talk with him regarding the store there and to complete an option for me to purchase it within a thirty-day period"; that Mr. Cotton seemed to be upset about it; that plaintiff started to tell him the terms of the sale and he acted very nervous and didn't "seem acceptable at all to it and spoke of the man that had been taken in the store there in my place by name of Frank Caporal"; that Mr. Cotton indicated to plaintiff that he could not approve the proposed sale of the store at Harlan by Mrs. Todd to plaintiff as there was another man running it. Plaintiff testified that Mr. Cotton then left the office and went outside to talk with Mr. Bisbee. Plaintiff also left the private office and went out into the general office and engaged in general conversation with other parties there. Mr. Cotton and Mr. Earl were in there. Plaintiff again asked Mr. Cotton what he figured on doing about the store and he (Cotton) acted very nervous. Thereafter plaintiff went into the washroom, at which time he saw Mr. Cotton and Mr. Earl talking together. The washroom was about 20 feet away from where plaintiff saw them talking. Later a fight occurred between the witness and the defendant Earl. Plaintiff describes it in this manner: "I just finished washing my face and hands with cool water because I had been sleepy in the afternoon, dried my face, wasn't finished drying my face when Earl or something hit me under the chin—." He said he didn't know Earl was in the room until he was hit; that he hadn't said anything to him; that Earl hit him right on the chin, "and I up and I hit at him, right between the eyes. I didn't notice he had on glasses"; that Earl then attempted to throw water on him and called him a dirty name, " and when he came toward me I just up with my foot and kicked him in the chest kind of back toward the toilet stool"; that Earl grabbed up a piece of gas pipe about two and one half feet long "and applied a head lock on me holding that gas pipe under his arm"; that this was a severe pressure, "the most terrible that I have ever had"; that they continued to fight; that plaintiff took the gas pipe from Earl; that Earl then ran out the door of the washroom; that when the door opened for Earl to go out plaintiff saw Cotton with a stick or club in his hand about 10 or 12 feet from the door; that when Earl went out of the door he immediately grabbed a "stick of

some kind''; that thereafter Mr. Bisbee came into the washroom; that he and Bisbee left the washroom and went toward the loading dock which was on the south side of the building; that Cotton and Earl were both outside the washroom, and ''They started after me and I ran to the loading dock and from there on around to the front of the warehouse''; that they had sticks in their hands at the time and Mr. Cotton said: ''You keep on running or I will kill you''. Plaintiff said that after he got off of the loading dock he went around the corner of the building, crossed the street and sat down on the east side of the street in front of the National Biscuit Company, which is directly across the street from the Western Auto Supply Company's warehouse; that at that time Mr. Cotton was at the front door of the warehouse and still had a stick in his hand; that plaintiff asked him: ''Shall I come in and get my hat and overcoat?'' and Mr. Cotton said: ''Don't you dare or I will kill you''. He testified that thereafter Mr. Earl brought his hat and coat to him, and what happened there is described by plaintiff in these words: ''The coat and hat was brought over by Mr. Arthur J. Earl, and he had my coat dragging on the ground by his right foot and I started to get up from the curb and he up and kicked me right over the chest here, right over the heart, right in here (indicating), knocked me back on the curb''. He said that this injured his hips and the lower part of his back; that Earl then ran back to the warehouse and that was the end of the fight.

On cross examination, plaintiff said that when he saw Cotton and Earl talking together, he could not hear what was said and he didn't know what they were talking about; that he saw Earl and Cotton with sticks or clubs and that he ran with Bisbee to the loading dock; that Mr. Cotton did not strike or touch him and that Earl was the only one who did so. Plaintiff also said that when he got off the loading dock and went across the street and sat down on the curb, no one was after him at that time.

Plaintiff's wife testified that she accompanied plaintiff and Mrs. Todd and was present in Mr. Cotton's office when her husband and Mrs. Todd and Mr. Cotton discussed the proposed sale of the Harlan store. She was not asked and did not state the details of the conversation between the parties. She stated that her husband had walked out of the office and returned and asked her if she would talk with Mr. Cotton and Mrs. Todd; that they didn't seem to want to talk to him and maybe they would talk to her; that she tried to do so, but they wouldn't talk with her. Thereafter, when the parties were outside the private office, Mrs. Knight testified that she saw Mr. Knight and Mr. Cotton together and that Mr. Knight tried to talk to Mr. Cotton, and ''Mr. Cotton threw his hands up over his head and yelled he didn't want to talk about it any more.'' She said she didn't know anything about the fight or the occurrences that took place after that

because she left the warehouse and went to her husband's automobile and never saw or heard any of the subsequent events.

Mrs. Joyce K. Todd was called as a witness by the defendants and testified that she met the plaintiff in Trenton that forenoon; that he wanted her to sell him her store at Harlan, Iowa, but she had declined to do so. Nevertheless, she accompanied plaintiff and his wife and child to Kansas City, and upon arriving at the warehouse "I rushed on ahead to greet Mr. Cotton. . . . I just said 'no sale' and he said 'I get you.'" She said she meant she didn't want to sell her store in Harlan; that the parties then went into Mr. Cotton's office and talked for sometime; that in this conversation Mr. Cotton informed plaintiff that he couldn't sell him the Harlan store, but would sell him another store. This witness heard loud voices coming from the washroom but she saw no blows struck, and this was after she had left Mr. Cotton's office. When she heard the racket in the washroom she returned to Mr. Cotton's office and he was there present.

Defendant Cotton testified in his own behalf and as a witness for all the defendants. His testimony shows that in November, 1939, he was employed as warehouse manager at Kansas City for the Company and had been so employed for about five years; that on the day in question he met plaintiff, Mrs. Todd and plaintiff's wife when they came into his office; that Mrs. Todd was the first one coming to meet him and that she then said: "I won't do anything this man says," and witness then testified: "So I just tried to listen to them and just visited there for a few minutes until I could find out what really was going on." Mr. Cotton further testified that while all the parties were in his office, defendant Earl came in and that he left his office to discuss with Earl the work he had been called there to do; that he then returned to his office and conversed further with Mrs. Todd. He was not certain plaintiff was in the office when he returned from his talk with Earl, but that plaintiff was in and out of the office several times. At any rate, plaintiff had left the office after Earl's first appearance, and witness was uncertain whether this was while he was outside the office talking to Earl or after his return to the office from having that conversation. He testified that sometime thereafter, Mr. Earl came in carrying his broken glasses; he was wet, and had a skinned place on his nose. Mr. Cotton then went to the washroom and met plaintiff and Mr. Bisbee, another employee of the Company, as they were leaving the building at the side door, and Mr. Cotton told plaintiff " to get out or I will call the police"; that plaintiff proceeded on out of the building. Witness denied that he had a club or stick in his hand and denied that he had directed or instructed Earl to do anything to the plaintiff, an denied all knowledge of any plot or plan to bring about an encounter between plaintiff and Earl. After plaintiff's departure, Mr. Cotton returned to his office and later saw Earl going out of the

door with plaintiff's coat and hat, but didn't see Earl hand the garments to plaintiff.

Mr. Bisbee testified that he was employed by the Company and was in the lobby of the warehouse office when plaintiff and Mrs. Todd arrived; that he was acquainted with the plaintiff, having known him about two years; that later that afternoon he was sitting in the office with Mr. Cotton and Mrs. Todd and defendant Earl walked in, and after describing Mr. Earl's battered appearance, witness testified that in response to Cotton's direction he went to see the plaintiff and asked him to leave the warehouse. Bisbee found the plaintiff in the washroom and he was then told by plaintiff that he, the plaintiff, "had made a terrible mistake, and he would like for me to help him out of there." Bisbee then accompanied plaintiff out, and as they left they met Mr. Cotton outside the washroom and the latter asked plaintiff to leave, and told him "If he didn't leave peacefully he would call the police." This witness also testified that Mr. Cotton and Mr. Earl did not have sticks in their hands, and denied that either one chased plaintiff. After accompanying plaintiff to the loading dock, Bisbee returned to the office.

Defendant Earl testified that at the time of the occurrence in question he was engaged in the plumbing business and had received a request to repair a leaking flush box at the warehouse of the Company; that when he arrived at the warehouse he had a short conversation with Mr. Cotton in the hallway back of the office, at which time Mr. Cotton requested him to ascertain if there was room to install another stool in the washroom and to estimate the cost of it; that he then went into the washroom and while endeavoring to locate the cause of the leak in the toilet, Mr. Knight struck him and called him a name and said: "You are not going to buy this store out from under me. He knocked me down, broke my glasses." He said he got up and they engaged in a fight for some time, in the course of which Mr. Knight threw a can of silica over him; that they exchanged a few blows, and that he attempted to explain to Mr. Knight that he didn't want any store; that he had a business of his own; that he then left the washroom and went to the office. Witness said there never was any gas pipe in his hand and there was no gas pipe there. Other witnesses said there was a piece of broomstick or mop handle in the washroom which was used as a window prop. After Mr. Earl had washed the blood off his face and cleaned up, he had some conversation with Mrs. Todd and she wrote him a check, over his protest, for his broken glasses; that he heard Mr. Knight calling from across the street for his hat and coat; that he thought it was a case of mistaken identity on the part of Mr. Knight and he had no ill-feeling against him on account of the occurrence; that when he approached Mr. Knight with the hat and coat, Mr. Knight attempted to lock his legs around those of Mr. Earl, and he then threw the hat and coat to Mr. Knight and

went back to the warehouse, and that he did not touch or kick Mr. Knight at that time. The foregoing is the substance of all the evidence in reference to the occurrence, with the exception of the testimony as to the nature and character of plaintiff's injuries.

The original petition filed in the case alleged that defendants, Cotton and Earl, acting for themselves and as the agents and servants of the Company, committed the assault, and aided, assisted, and abetted each other in connection therewith. The amended petition, on which the case was tried contains the same allegations and, in addition, the allegation that Earl was aided, abetted, and assisted by Cotton acting for himself and the Company, "and in concert together, and with the knowledge and design of each other's purpose."

The original petition filed in the case alleged that the assault was committed on the premises of the Company; but the amended petition alleges that defendants attacked and beat plaintiff, kicked him on the warehouse premises and "forcibly ejected him from said premises, and pursued him with clubs, and continued to beat and kick him about the chest".

In other words the original petition alleged that the assault took place in the warehouse, and the amended petition sought to allege a continuing assault, consistng not only of what occurred in the warehouse, but after plaintiff left the same.

In plaintiff's instructions to the jury he confined the acts and conducts of the parties to those occurring in the warehouse. Plaintiff's Instruction No. One reads as follows:

"The Court instructs the jury that if you find and believe from the evidence that on or about November 25, 1939, the plaintiff *entered into and upon the premises of the Western Auto Supply Company*, a corporation, at 2114 Central Street, Kansas City, Jackson County, Missouri, for the purpose of transacting business with said Company, if so, *and while plaintiff was thereon*, and without just cause or provocation on his part, if you so find, the defendant, A. J. Earl did *then and there* assault and beat plaintiff, if so, causing him injury thereby, if so, then your verdict may be for plaintiff and against said defendant." (Italics ours.)

Plaintiff's Instruction No. Two reads as follows:

"The Court instructs the jury that if you find and believe from the evidence on or about November 25, 1939, the plaintiff *entered into and upon the premises of the Western Auto Supply Company* in Kansas City, Jackson County, Missouri, located at 2114 Central Street for the purpose of transacting business with said Company, if so, and while plaintiff *was thereon*, and without just cause or provocation on his part, if you so find the defendants, A. J. Earl and William R. Cotton, acting in concert and in cooperation with each other, if so, and while the defendant Cotton was acting as the agent, servant and employee of the defendant Western Auto Supply Company, acting

within the course and scope of his employment with said defendant Western Auto Supply Company, and with common design and knowledge of each other's purpose, if you so find, did *then and there* assault and beat plaintiff, if so, causing him injury thereby; if so, then your verdict may be for plaintiff and against all of the defendants; and this is true even though you find and believe from the evidence the defendant William R. Cotton did not lay hand on plaintiff, or strike plaintiff.''

It is insisted by the defendants Earl, and Cotton, that the court erred in failing to give their instructions in the nature of demurrer to the evidence at the close of the entire case, for the reason, among others, that the amended petition, upon which the case was tried, alleges a conspiracy between the three defendants; that the case was submitted as to them in plaintiff's Instruction No. Two on the theory of conspiracy but that there was no evidence of a conspiracy.

Plaintiff answers this contention by stating that the matter of a conspiracy is an issue entirely foreign to the case; that he does not claim that there was any evidence to show a conspiracy; that the entire case against Cotton and the Company is based upon the conduct of the defendant, Cotton, in aiding and abetting Earl in the assault.

We are of the opinion that the portion is broad enough to authorize a submission of the case solely upon the theory of aiding and abetting. (See 12 C. J. p. 639.) Aider and abettor '' as used with reference to civil liability, the phrase has been defined as any person who is present at the commission of a tort, encouraging or exciting the same by words, gestures, looks, or signs, or who in any way or by any means countenances and approves the same.'' (3 C. J. p. 505.) Plaintiff's Instruction No. Two contains language indicating that plaintiff sought to submit the issue of conspiracy. ''To constitute a conspiracy there must be unity of design and purpose, for the common design is of the essence of the conspiracy''. (12 C. J. p. 543.) We need not go into the technical aspects of the law of conspiracy as applied to the facts of this case because, admittedly, there is no evidence of a conspiracy. We cannot hold plaintiff's Instruction No. Two erroneous for the reason assigned. There is something more submitted therein than a mere conspiracy. (12 C. J. p. 630.) The instruction submits a joint assault by Cotton and Earl. Whether, under the theory upon which this case is presented, there is room for a submission on the theory of a joint assault will hereinafter be alluded to.

In view of the fact that the judgment must be reversed and the cause remanded on account of other errors assigned by the defendants, and the cause will probably be retried, it is proper for us to pass upon the question as to whether there was any evidence tending to show that Cotton aided and abetted Earl in the assault. We may say here that there is no question but that the evidence taken in its most favorable light to plaintiff shows that Earl committed an assault upon him,

although it is doubtful if plaintiff's evidence shows any motive on the part of the defendant, Earl, for his conduct.

In the course of their briefs the defendants, Cotton, and the Company, state that anything that was done by the former was in an effort to have plaintiff leave the premises and, consequently, they are not liable. In this connection said defendants cite the case of Norris v. Whyte, 158 Mo. 20.

Plaintiff, in connection, states: "Mr. Cotton was within his rights in ordering plaintiff to leave the premises and ordering him to remain away therefrom, but if the servant continues about the business of the employers and adopts methods, which he deems necessary, expedient, or convenient, and the methods adopted prove hurtful to others, the employer is liable. . . . There is no argument with appellants' contention that Mr. Cotton was in his legal rights in ordering plaintiff to leave the premises, which, of course, admits again that Mr. Cotton was in charge of said department of the defendant; however, if in ordering him to leave the premises he aids and abets, or commits an act which is harmful to the plaintiff, both he and his employer are liable. . . . The plain fact is that Earl assaulted plaintiff, and Cotton, the admitted manager of the Western Auto Supply Company's warehouse department, aided and abetted and acted in concert with Earl in his assault upon the plaintiff. Plaintiff's testimony through the record shows clearly that Cotton, with a stick in his hand, chased the plaintiff, together with Earl, out the back door and to the front door of the building and made several exclamations to him regarding, first, upon his leaving the premises, and second, upon his returning thereto."

It thus appears that it is plaintiff's contention that there was no conspiracy shown, but merely that Cotton aided and abetted Earl in the assault, and that such aiding and abetting is confined to the action of Cotton in chasing plaintiff with a stick, after the occurrence in the washroom, and telling him, "You keep on running or I will kill you", and stating to plaintiff after the latter left the premises: "Don't you dare come back or I will kill you."

It being conceded that Cotton was within his rights in ordering plaintiff off of the premises, just how he aided and abetted defendant, in a legal sense, is not pointed out by plaintiff. If Cotton had the right to order plaintiff off of the premises it would not make any difference if his conduct incidently aided Earl. The evidence shows that there had been a loud commotion in the washroom; that plaintiff had struck Earl several times, and detailing what occurred in the washroom, plaintiff's evidence clearly shows that he got the better of Earl in the fight. Earl received injuries to his jaw and head. Plaintiff admitted that he threw a can of washing powder on Earl. Earl testified that as a result of this he was a "pretty sight. . . . You should have seen the suit of clothes that I had on by the time that got all

over me.'' Earl came running out of the washroom with his glasses broken and, from the appearance of things to anyone who was standing near the door as was Cotton, Earl was with drawn from the fight, showing evidence of physical injury as a result thereof. It would appear, under the circumstances, that Cotton was within his rights in ordering plaintiff off of the premises. However, it is unnecessary for us to pass upon this question because that right is admitted by the plaintiff. Cotton, concededly, had the right to order plaintiff off of the premises. The fact that the occasion of the ordering happened at a time when Earl was pursuing plaintiff, apparently attempting to renew the fight, would not make Cotton or the Company liable for his acts. There may be room for a finding that Cotton's motives were not based entirely upon his desire to have plaintiff leave the premises on account of the fact that plaintiff had engaged in a violent affray. Cotton pursued plaintiff with a stick, using language that indicated unusual anger on his part and there was evidence that he was irritated with plaintiff prior to the fight in the washroom. However, it being conceded that he was within his rights in ordering plaintiff off of the premises, any other motive that he may have had in doing so is of no avail to plaintiff. [Brothers v. Morris, 49 Vt. 460; Kiff v. Youmans, 86 N. Y. 324.]

There is no claim that plaintiff was injured in the process of his being gotten off of the premises, and there is no contention that Cotton used unnecessary force in chasing plaintiff with a stick or club in that Cotton did not first make an effort to have plaintiff leave the premises by the use of less violent methods or, in other words, by a mere order to plaintiff to leave. In fact, the sole claim of plaintiff is that Cotton did not commit any assault directly himself that he merely aided and abetted defendant in the latter's assault.

The question as to whether alleged assaults committed separately by Cotton and Earl could be sued for in one action is not before us for decision.

We conclude that there is no evidence that Cotton aided and abetted Earl in the latter's assault on plaintiff, in any legal sense.

It is insisted by all of the defendants that plaintiff's instruction on the measure of damages (it covers the subject of both actual and punitive damages) is erroneous. This instruction told the jury that they could take into consideration ''the acts complained of''. Of course, some of the acts complained of were contained in plaintiff's Instruction No. Two which submitted a conspiracy. Admittedly, there was no evidence of such. The instruction on the measure of damages is erroneous, at least insofar as punitive damages are submitted therein. It is insisted that the verdict for actual damages is excessive. We think that this contention must be sustained. It will be noted that plaintiff submitted the case to the jury, solely, upon the acts and conduct of the defendants that took place in the warehouse of the

Company, and did not submit the circumstances occurring after plaintiff had left the warehouse and was across the street.. However, no effort was made by plaintiff, in proving his injuries, to separate those received while in the warehouse and those received outside thereof and, from the description of the injuries, many of them could have been rceived at either place or as a result of the two attacks combined made upon him by Earl. Plaintiff testified that the "most lasting" injury he received "was the one where he kicked me over the heart right in here." This kicking occurred across the street outside of the warehouse. The fact that it may be impossible to separate some of the injuries he received as being attributable to one or the other of the occurrences in question would not justify plaintiff's recovery for all those received upon a submission of the incidents that happened in the warehouse alone. [See Albrecht v. St. Hedwig's R. C. Benevolent Ass'n., 171 N. W. 461,462.] Under the circumstances plaintiff was entitled to recover merely nominal actual damages. [Robertson v. Sisk, 171 S. W. (Ark.) 80.]

The Company insists that it cannot be held liable for the acts of Cotton, in any event, because he had completed the business of the Company when the fight occurred and if he were guilty of any wrong, it was an act personal to himself for which the Company is not liable, citing in support of this contention, among other authorities, Milazzo v. K. C. Gas Co., 180 S. W. (2d). We cannot say, as a matter of law, that, in ordering and getting plaintiff off of the premises, Cotton was not acting in the course of his authority as the agent of the Company. [Masons v. Downtown Garage, 53 S. W. (2d) 409.]

The judgment is reversed and the cause remanded. All concur.