**TERRYDALE LIQUIDATING TRUST, Plaintiff,**

v.

**Herbert BARNESS, John F. Bishop, Edgar H. Chappell, Charles W. Corbitt, George S. Mann, Brooks Walker, Jr., Louis W. Walker, and Charles M. Williams, individually and as Trustees of, and David R. Bryant as Trustee of, San Francisco Real Estate Investors, and Keith L. Brown, individually, and San Francisco Real Estate Investors, Inc., Defendants.**

**SAN FRANCISCO REAL ESTATE INVESTORS, INC., a Delaware corporation, successor in interest to San Francisco Real Estate Investors, a California real estate investment trust, Counterclaimant and Third-Party Plaintiff,**

v.

**TERRYDALE LIQUIDATING TRUST, a New York business trust; Terrydale Realty Trust, a Missouri business trust; Oliver R. Grace, Oliver R. Grace, Jr., Emilio G. Collado, William Bolton, and Robert A. Posner, individually and as Trustees of Terrydale Liquidating Trust, Counterdefendants and Third-Party Defendants.**

No. 82 Civ. 7920 (LBS).

United States District Court, S.D. New York.

Nov. 19, 1984.

Leventritt, Lewittes & Bender, Garden City, N.Y., for plaintiff; Sidney Bender, Garden City, N.Y., of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City; Landels, Ripley & Diamond, San Francisco, Cal., for defendants; Douglas M. Kraus, Barry H. Garfinkel, Erskine D. Henderson, New York City, Harvey L. Leiderman, San Francisco, Cal., of counsel.

SAND, District Judge.

Plaintiff, Terrydale Liquidating Trust (hereinafter "TLT"), a New York business trust, brings this action against San Francisco Real Estate Investors, Inc. and the individual trustees of San Francisco Real Estate Investors, seeking to hold them liable as aiders and abettors of an alleged breach of fiduciary duty and as constructive trustees of property sold to them in violation of the seller's fiduciary duties and Declaration of Trust.[1] Defendants have moved for summary judgment pursuant to F.R.Civ.P. 56. Plaintiff has cross-moved for partial summary judgment pursuant to F.R.Civ.P. 56 on the issue of liability.

For the reasons detailed below and applying Missouri law, we conclude that, after extensive discovery, plaintiff is unable to show that defendants had actual knowledge of an alleged breach of fiduciary duty. We therefore grant defendants' motion for summary judgment in part and dismiss the claim that they were aiders and abettors of said breach. Concluding, however, that material questions of fact exist as to whether there was a breach of fiduciary obligation or Declaration of Trust and, if so, whether defendants had sufficient notice thereof such that they held the acquired assets as constructive trustees for plaintiff's benefit, we deny defendants' motion for summary judgment as to plaintiff's equitable claim for restitution. Plaintiff's motion for partial summary judgment is also denied.

## FACTS

Plaintiff is a successor in interest to Terrydale Realty Trust (hereinafter "TRT"), a Missouri real estate investment trust[2] (hereinafter "REIT") which was the entity in existence at the time of the conduct at issue in this case. Defendant SFREI, Inc.

---

1. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332 (1982). Plaintiff is a New York business trust; defendant SFREI, Inc. is a Delaware corporation and the individual trustees are citizens of California, Canada, Colorado, Massachusetts and Pennsylvania.

2. TRT was a qualified real estate investment trust within the relevant provisions of the Internal Revenue Code, 26 U.S.C. §§ 856–860 (1982). Under these provisions, a qualified REIT is taxed only on its undistributed income and capital gains; distributed income is taxed only at the shareholder level.

was formerly a California REIT, known as San Francisco Real Estate Investors, whose acts (and the acts of its trustees) are relevant to the instant action. San Francisco Real Estate Investors and its trustees shall be collectively referred to as "SFREI."

The instant case arises out of the actions of TRT trustees taken in response to an unsolicited tender offer for TRT shares.[3] On January 9, 1981, BCG Associates (hereinafter "BCG"), a New York limited partnership in which third-party defendants William Bolton, Oliver Grace, Jr., and Robert Posner are general partners, commenced an unsolicited tender offer for 160,-000 TRT shares, or approximately 34.7% of its outstanding shares, at a price of $33.50 per share. This offer, if successful, would have given BCG virtual majority ownership of TRT.[4] According to the BCG Offer to

Purchase, the offer was made in order to obtain control of TRT and to defeat proposed amendments to its Declaration of Trust. The offer was set to expire on February 10, 1981.

On January 19, 1981, the TRT trustees met to consider the BCG tender offer.[5] After discussing both the merits of, and a number of perceived problems with, the BCG offer, the trustees decided to continue to pursue alternatives to the offer. According to the minutes of a subsequent meeting of TRT trustees, TRT met or otherwise communicated with seven other bidders for the purpose of soliciting either a tender offer for all or part of the TRT shares or an offer to purchase the assets of TRT. The trustees also attempted, without success, to persuade BCG to amend its offer to provide for the purchase of all outstanding TRT shares.[6]

---

3. The events giving rise to this lawsuit have been the basis of prior litigation before this Court. See *Terrydale Liquidating Trust v. Gramlich*, 549 F.Supp. 529 (S.D.N.Y.1982) (action by TLT against TRT trustees, SFREI and others for violation of federal securities laws); *Bolton v. Gramlich*, 540 F.Supp. 822 (S.D.N.Y.1982) (action by defeated tender offeror against TRT trustees, SFREI and others for violation of federal securities laws). Familiarity with these decisions is assumed.

4. Determinations of percentage share ownership are complicated by the existence of warrants to

purchase 221,800 TRT shares; warrants to purchase 115,937 TRT shares had been exercised as of January 8, 1981. See Defendants' Ex.A, SFREI's Requests for Admissions (BCG Offer to Purchase), at 2.

The following schedule provides a summary of BCG's share ownership, both including and excluding the outstanding warrants which had been exercised prior to the BCG tender offer:

| | Before tender offer | Tender offer, if fully subscribed | After tender offer, if fully subscribed |
|---|---|---|---|
| shares | 123,245 (26.7%) * | 160,000 (34.7%) * | 283,245 (61.4%) * |
| warrants | 4,500 | – | 4,500 |
| total | 127,745 (22.1%) ** | 160,000 (27.8%) ** | 287,725 (49.9%) ** |

\* based on 461,064 outstanding shares as of 12/16/80

\*\* based on 577,001 shares (461,064 outstanding shares, and exercise of warrants to purchase 115,937 TRT shares)

---

5. The trustees of TRT at the time of the challenged events were J. Russell Gramlich (an approximately 19.6% shareholder); John G. Gramlich, his son (who, together with Michael J. Gramlich, his brother, and James A. Kostoryz, his brother-in-law, owned directly and through other organizations approximately 8.8% of TRT's shares); J. Harlan Stamper, whose law firm was counsel to TRT; Thomas J. Murphy, and John D. O'Flaherty. The Gramlich family also owned approximately 68% of Terrydale Management Corporation (hereinafter "TMC"),

a corporation which received management and brokerage fees for services performed in connection with the managing of TRT properties.

6. BCG considered offering to issue bonds with a fair market value of $33.50 in exchange for the remainder of the outstanding TRT shares. See Defendants' Ex. B, SFREI's Requests for Admissions (minutes of 1/19/81 TRT Trustees meeting), at 3–4. This proposal was apparently subsequently modified to include terms less favorable to TRT. See Defendants' Ex. C, SFREI's

Just prior to this meeting of TRT trustees, TRT was contacted by George Mann, president of Unicorp Financial Corporation, a Canadian company which owned approximately 40% of SFREI. Mann expressed Unicorp's interest in making a tender offer for at least some portion of TRT shares.[7] After considering the opportunity to bid for TRT shares, Unicorp decided not to enter into the battle for control of TRT. Mann, however, notified SFREI of the opportunity to acquire TRT shares.[8] Discussions ensued between representatives of TRT and SFREI. Although SFREI was initially interested in acquiring all of the outstanding TRT shares, SFREI eventually proposed instead to purchase approximately 80% in value of TRT's assets, specifically, four office buildings located in Denver, Colorado. The TRT trustees met on February 2, 1981 to consider the SFREI proposal, as well as to review various other alternatives to the BCG tender offer. An additional meeting of "independent" trustees, *i.e.*, those who were not members of the Gramlich family (*see* n. 5 *supra*), was held on February 5; at this meeting, the trustees concluded that the sale of the Denver properties to SFREI was in the best interests of all TRT shareholders. On February 6, the sale to SFREI was unanimously approved by all of the TRT trustees. In addition, the trustees adopted and disclosed a plan to liquidate the trust and to distribute the proceeds of the SFREI sale, along with the remaining trust assets, to TRT shareholders. The trustees also announced that a liquidating dividend of $24 per share was to be distributed on February 23 to all TRT shareholders of record as of February 19.

After the trustees' decision to sell and liquidate was announced, BCG extended its tender offer expiration date to February 19 and adjusted its offering price to $9.50 per share in order to take account of the $24 per share liquidating dividend. BCG acquired 80,884 shares pursuant to its tender offer, leaving it with 208,629 shares, or approximately 38% of the outstanding TRT shares. During 1981, BCG continued to purchase TRT shares through a series of open market purchases. By January 1982, BCG had apparently acquired just under 50% of outstanding TRT shares. An additional liquidating dividend of $9.50 was distributed to TRT shareholders on January 12, 1982. On January 28, 1982, the TRT shareholders approved the creation of TLT[9] and elected a slate of BCG nominees to serve as trustees of TLT.[10] The instant lawsuit ensued.

Plaintiff's claims are essentially two-fold. First, plaintiff seeks to hold defendants civilly liable as aiders and abettors; specifically, plaintiff claims that the TRT trustees breached their fiduciary duties by selling and liquidating the trust property for allegedly self-interested reasons and at allegedly "fire sale" prices, and that SFREI knowingly and substantially assisted the trustees in this endeavor. Second, plaintiff seeks to hold defendants accountable as constructive trustees; specifically, plaintiff claims that the sale and liquidation, in addition to being tortious, were performed without obtaining the necessary approval allegedly required by the TRT Declaration of Trust, and that SFREI had "notice" of the TRT trustees' breaches of fiduciary duty and trust. As relief for the above claims, plaintiff seeks (1) an accounting from SFREI for losses suffered by TRT on the sale of TRT properties, damages, expenses and SFREI profits earned from the properties; and (2) a return to the "status

Requests for Admissions (minutes of 2/2/81 TRT Trustees meeting), at 5–6.

**7.** Plaintiff's Ex. 486 indicates that the Unicorp offer involved the possible acquisition of 300,000 TRT shares.

**8.** Mann was a member of SFREI's Board of Trustees.

**9.** TLT, a liquidating trust, was created in accordance with § 337 of the Internal Revenue Code as successor to the remaining undistributed assets of TRT.

**10.** The plaintiff in this action is thus, in effect, the "defeated" tender offeror.

quo ante." [11] On February 18, 1983, this Court denied defendants' motion to dismiss the complaint. On February 28, 1984, this Court denied defendants' motion for summary judgment without prejudice to renewal upon completion of further discovery. Discovery was thereafter conducted during which numerous depositions were taken and numerous documents were produced. The instant motions ensued.

## DISCUSSION

### A. Applicable Law

A federal court exercising diversity jurisdiction must apply the substantive law of the forum in which it sits. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This includes the forum state's choice of law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Since the instant case involves the activities of a Missouri real estate investment trust whose Declaration of Trust designated Missouri law as applicable, we conclude that Missouri law should be applied. *See Skolnik v. Rose,* 55 N.Y.2d 964, 434 N.E.2d 251, 449 N.Y.S.2d 182 (1982). To the extent that no directly applicable Missouri precedents exist, we shall refer to the law of other jurisdictions for guidance.

### B. Standard of Review

Summary judgment may be granted only when it appears to the court that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). A court "cannot *try* issues of fact but can only determine whether there *are* issues of fact to be tried." *Katz v. The Goodyear Tire and Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984) (quoting *Empire Electronics Co. v. United States,* 311 F.2d 175, 179 (2d Cir.1962) (emphasis in original)). In addition, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Id.* Thus, where "the party against whom summary judgment is sought comes forth with affidavits or other material ... that generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate." *Id.* (quoting *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir. 1980)). Summary judgment is to be granted only where the court "is convinced as a matter of law that the suit can have only one possible outcome." *Reliance Insurance Co. v. Barron's,* 442 F.Supp. 1341, 1344 (S.D.N.Y.1977).

### C. Theories of Liability

#### 1. Aider and Abettor Liability

A person may be liable, as an aider and abettor, for the tortious conduct of another if the person "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876 (1982). Although Missouri courts have apparently not expressly adopted the Restatement formulation of civil aider and abettor liability,[12] this standard has been applied in other jurisdictions in cases involving alleged breaches of fiduciary duty, *see Marine Midland Bank v. Smith,* 482

---

**11.** Plaintiff does *not* seek the return of (1) the Lincoln Tower Building, which was subsequently acquired by Subdale Corporation pursuant to the exercise of a right of first refusal which its parent, the Lincoln Tower Building Corporation, possessed with respect to TRT's sale of the building, or (2) liquidating distributions received by non-trustee shareholders of TRT.

**12.** Missouri aider and abettor cases involve either criminal conduct, *see, e.g., Helming v. Adams,* 509 S.W.2d 159, 162 (Mo.Ct.App.1974), or physical intentional torts, *see, e.g., Knight v.*

*Western Auto Supply Co.,* 239 Mo.App. 643, 193 S.W.2d 771 (1946). Both of these cases, however, articulate a standard for determining aider and abettor liability which has been adopted in the civil context, *see, e.g., IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980), and has been harmonized with the Restatement standard. *See Landy v. Federal Deposit Insurance Co.,* 486 F.2d 139, 163–64 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069 (N.D.Cal.1979).

F.Supp. 1279, 1290 (S.D.N.Y.1979), *aff'd,* 636 F.2d 1202 (2d Cir.1980); *Gilbert v. Bagley,* 492 F.Supp. 714, 735 (M.D.N.C.1980), common law fraud, *see Keller v. Coyle,* 499 F.Supp. 1031, 1033–34 (E.D.Pa.1980), *see also Kranzdorf v. Green,* 582 F.Supp. 335 (E.D.Pa.1983) (applying similar standard in fraud case), and securities fraud, *see Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 483 n. 5 (2d Cir.1979); *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 162–64 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Its use in the instant case is thus considered appropriate. Under this standard, plaintiff must demonstrate three elements in order to impose aider and abettor liability on SFREI: (1) a breach of fiduciary duty by TRT trustees; (2) knowledge of this wrongdoing by SFREI; and (3) substantial assistance or encouragement provided by SFREI to the TRT trustees. We will consider these elements in turn.

### a. *Breach of Fiduciary Duty* [13]

In order to determine whether a breach of fiduciary duty has occurred, this Court must first determine the standard under which the TRT trustees' conduct should be evaluated. Specifically, we must determine whether the business judgment rule/duty of loyalty analysis—one which is frequently employed in evaluating the acts of corporate directors taken in response to an unsolicited tender offer or takeover bid—is applicable to the trustees of a REIT.[14] Missouri courts do not appear to have addressed this issue.

■ For several reasons, this Court concludes that the business judgment rule/duty of loyalty analysis should be applied. First, a number of courts have applied the business judgment rule to the activities of REIT trustees. *See San Francisco Real Estate Investors v. REIT of America,* [1982 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,874, at 94,555–56 (D.Mass. Nov. 17, 1982) (enactment of by-law allegedly designed to limit concentration of REIT share ownership and block unsolicited tender offers), *aff'd in part and rev'd in part on other grounds,* 701 F.2d 1000 (1st Cir.1983); *see also Unicorp Financial Corp. v. First Union Real Estate Equity and Mortgage Investments,* 515 F.Supp. 249, 256 (S.D.Ohio 1981) (applying similar analysis to activities of REIT trustees); *cf. Hasan v. Clevetrust Realty Investors,* 729 F.2d 372 (6th Cir.1984) (termination of shareholder derivative action by REIT special litigation committee).

■ Second, the trustees of a REIT are functionally more similar to corporate directors than to ordinary trustees. *See* 16A Fletcher Cyclopedia of the Law of Private Corporations § 8249, at 619 (R. Eickhoff rev. ed. 1979). Indeed, whereas ordinary trustees are obligated to preserve and conservatively invest trust property, the profit-making responsibilities of a business trustee inevitably entail the exercise of business judgment similar to that of a corporate director. *See Plymouth Securities Co. v. Johnson,* 335 S.W.2d 142, 149 (Mo. 1960). The functional similarity and shared characteristics of business trusts and corporations—centralized management, transferable ownership in the form of shares, continuity of life, separate and distinct legal existence, a charter-like declaration of rights and obligations, and a profit-making purpose—has been recognized. *See Morrissey v. Commissioner,* 296 U.S. 344, 56

---

**13.** Although we conclude for reasons stated herein that summary judgment should be granted on plaintiff's aider and abettor claim because of the absence of actual knowledge by the alleged aider and abettor, we discuss the breach of fiduciary duty element in detail because of its relevance to the restitutional claim as to which summary judgment is denied.

**14.** Defendants appear to assume that this mode of analysis is appropriate. Plaintiff's briefs are devoted largely to a refutation of defendants' analysis of the business judgment rule as applied to the facts of this case, rather than a challenge to the applicability of this mode of analysis in general. Plaintiff does, however, note at one point that the trustees are subject to the duties imposed on trustees generally, *see* Plaintiff's Reply Brief, at 67–68, thus at least suggesting that a stricter standard should apply.

S.Ct. 289, 80 L.Ed. 263 (1935); *State Street Trust Co. v. Hall,* 311 Mass. 299, 41 N.E.2d 30, 33 (1942). A REIT in particular is, in all respects other than tax treatment, functionally indistinguishable from a corporation. *See* Stand.Fed.Tax Rep. (CCH) ¶ 4099F.015, at 46,493 (1982) (a REIT, "in addition to central management, must possess all other necessary attributes that would, except for REIT Code provisions, cause it to be taxed as a corporation"). Based on these considerations, it is appropriate to judge the conduct of REIT trustees by the standards generally applied to corporate fiduciaries.

Third, the TRT Declaration of Trust is not inconsistent with the application of the business judgment rule/duty of loyalty analysis. The Declaration of Trust gives the trustees discretion substantially similar to that of corporate directors. *See* TRT Declaration of Trust, Art. III, § 1. In addition, the trust liability provision is similar to the Missouri business judgment rule. *Compare* TRT Declaration of Trust, Art. III, § 15 ("No Trustee shall be individually or personally liable to any Shareholder, other Trustee or any other Person for any errors of judgment or for any action taken or omitted in good faith ... Nothing contained in the Declaration, however, shall protect any Trustee against liability to the Trust, or the Shareholders for action taken or omitted by him in bad faith or for his willful misfeasance or reckless disregard of his duties or his own gross negligence.") *with Leggett v. Missouri State Life Insurance Co.,* 342 S.W.2d 833, 851 (Mo.1960) (courts will not interfere with internal management of corporation except in cases of fraud, bad faith, breach of trust, gross mismanagement, or ultra vires acts). And although both the TRT Declaration of Trust and Missouri law indicate that a business trust is not a corporation, *see* TRT Declaration of Trust, Art. I, § 3; *Manufacturers' Finance Trust v. Collins,* 227 Mo. App. 1120, 58 S.W.2d 1004 (1933) (business trust, unlike corporation, need not acquire license to do business), these sources do not address either the standard to apply in examining the conduct of business trustees

or the relevance of REIT status, as opposed to an ordinary business trust, in this regard.

Fourth, the challenged conduct in this case more closely resembles the conduct of corporate directors faced with an unsolicited tender offer, rather than a classic case of trustee malfeasance, *i.e.,* engaging in transactions with the trust on unfair terms and with self-interested motives. *Cf. Beedle v. Campbell,* 100 F.2d 798 (8th Cir.) (trustee's secret purchase of trust property deed constitutes breach of duty), *cert. denied,* 307 U.S. 631, 59 S.Ct. 835, 83 L.Ed. 1514 (1939); *Kotimsky v. Lubin,* 62 F.Supp. 710 (E.D.Ill.1945) (business trust promoter/director liable for breach of fiduciary duty based on non-arm's-length transaction with trust entered into for personal gain); TRT Declaration of Trust, Art. III, § 3(n) (dealings between trust and trustees governed by Missouri equity law regarding fiduciary obligations).

█ Finally, the practical similarity between the standards governing trustees and corporate directors has been recognized. Thus, when either directors or trustees engage in self-dealing or enter into a transaction in which they have a conflict of interest, the transaction will be upheld only if the fiduciary involved can demonstrate the fairness and reasonableness of the transaction. *See Morrissey v. Curran,* 650 F.2d 1267, 1274–75 & n. 7 (2d Cir.1981). To the extent that a stricter fiduciary standard may be appropriate in judging the conduct of business trustees, *see* 13 Am.Jur.2d *Business Trusts* § 61, at 424 (1964) (relationship between business trustees and beneficiaries is comparable to, but more confidential than, relationship between corporate directors and corporation); *see also McDaniel v. Frisco Employees' Hospital Association,* 510 S.W.2d 752, 756–57 (Mo. Ct.App.1974), we believe that this notion may best be incorporated in our application of the business judgment rule analysis itself. *See* pages 1017–1027 *infra.* We will thus carefully look to determine whether the trustees have acted with disinterest and "scrupulous good faith," *McDaniel, supra,*

510 S.W.2d at 758, and if not, whether the challenged sale and liquidation transactions were fair and reasonable to the trust and its shareholders.

Although we are unable to find relevant Missouri precedent for judging the acts of directors or business trustees taken in response to an unsolicited takeover bid, the precedents governing the business judgment rule in general provide a helpful starting point. Under Missouri law, although courts will typically not interfere with the internal management of a corporation, they will do so where the directors or trustees act in bad faith or engage in fraud, breach of trust, gross mismanagement or ultra vires acts. *Leggett, supra,* 342 S.W.2d at 851; *Broski v. Jones,* 614 S.W.2d 300, 304 (Mo.Ct.App.1981) (courts will not interfere where directors exercise business judgment fairly and honestly). Indeed, in circumstances involving the disposition of corporate assets or corporate dissolution, corporate fiduciaries are held to a standard of "scrupulous good faith in the fiduciary role as guardians of the corporate welfare." *McDaniel, supra,* 510 S.W.2d at 758 (trustees of incorporated nonprofit association); *Gieselmann v. Stegeman,* 443 S.W.2d 127 (Mo.1969) (directors are in position of "highest trust and confidence" and "utmost good faith" is required in exercise of powers). Consistent with this obligation, such fiduciaries cannot exercise their power in order to satisfy their own self-interest. *See Emergency Patient Services, Inc. v. Crisp,* 602 S.W.2d 26, 28 (Mo.Ct.App.1980) (directors prohibited from making "any self-serving disposition of [corporate assets] against the interests of the corporation"); *Johnson v. Duensing,* 351 S.W.2d 27 (Mo.1961); ac-

cord *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264–265 (2d Cir.1984); *Greer Inv. Co. v. Booth,* 62 F.2d 321, 325 (10th Cir.1932) (business trustees must manage assets for benefit of shareholders and not "with an eye to their personal advantage or profits"). Such self-interest is demonstrated when directors or trustees enter into a transaction in order to acquire a benefit not shared by shareholders generally. *See Gieselmann, supra; Cheff v. Mathes,* 241 Del.Ch. 494, 199 A.2d 548, 554–55 (1964); *accord Buffalo Forge Co. v. Ogden Corp.,* 555 F.Supp. 892, 904 (W.D.N.Y.1983), *aff'd,* 717 F.2d 757 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983).

When fiduciaries act in furtherance of their own self-interest or for other improper motives, the duty of loyalty imposed upon fiduciaries requires them to demonstrate the fairness and reasonableness of their actions. *See Norlin, supra,* at 264–265.[15] Retention of control, while often a motive for directors' opposition to unsolicited takeover bids, is not the only illegitimate purpose which will shift the burden to the directors to justify their acts. *See Buffalo Forge, supra,* 555 F.Supp. at 904; *cf. Gieselmann, supra,* 443 S.W.2d at 136. Moreover, this self-interest need not be the sole motive for the fiduciaries' acts, *see Mobil Corp. v. Marathon Oil Co.,* [1981–1982 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 98,375, at 92,285 (S.D.Ohio Dec. 7, 1981), *rev'd on other grounds,* 669 F.2d 366 (6th Cir.1981); *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 382–84 (2d Cir.1980), particularly where the alleged basis for self-interest is a readily identifiable and sizable financial interest,

---

**15.** Missouri courts have applied a similar standard to transactions involving self-dealing between the fiduciary and the corporation. *See, e.g., Ramacciotti v. Joe Simpkins, Inc.,* 427 S.W.2d 425 (Mo.1968). Yet, if plaintiff establishes that the trustees' decision to sell and liquidate trust assets was founded on considerations of personal profit or self-interest, this would also appear to be sufficient grounds for imposing a burden of justification on the trustees. Indeed, a similar standard has been applied in

the context of corporate takeover battles. *See, e.g., Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264–265 (2d Cir.1984); *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 382 (2d Cir.1980); *Mobil Corp. v. Marathon Oil Co.,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,375, at 92,284 (S.D.Ohio Dec. 7, 1981), *rev'd on other grounds,* 669 F.2d 366 (6th Cir.1981). We thus consider it appropriate to apply this standard to the instant case.

as in the instant case.[16] Under this standard, even if there are legitimate business reasons for the directors' acts, the director must demonstrate the fairness and reasonableness of a challenged transaction if the complaining party shows that the director was in fact motivated by self-interest in his or her conduct. *See Mobil, supra; cf. Buffalo Forge, supra,* 555 F.Supp. at 904.

Plaintiff advances several bases for a finding of trustee self-interest. These arguments will be discussed in turn for purposes of determining whether any issues of material fact remain with respect to plaintiff's claim.

■ Plaintiff alleges that trustees John Gramlich and J. Russell Gramlich acted in a self-interested manner by virtue of the Gramlich family's ownership interest in, and control of, TMC, the manager of the trust properties.[17] Plaintiff has submitted sufficient evidence to create an issue of fact in this regard. TMC received $529,525 in management fees and commissions for the year ended September 30, 1981 and additional fees through February 5, 1982. Of the 1981 amount, $395,754 was received subsequent to the TRT sale and adoption of its liquidation plan; $283,254 was received in connection with the transfer of trust assets during the 1981 fiscal year. Plaintiff has produced some evidence to indicate that preservation of the TRT/TMC relationship was of concern to the Gramlichs. Although this concern was expressed primarily with respect to a proposed tender offer by Unicorp, a transaction that was never consummated, it still sheds light on the motives of the trustees at the time of the BCG tender offer.[18] Even the sale and liquidation plan eventually adopted by the trustees enabled the Gramlichs to preserve the TMC management relationship for almost a full year. Indeed, the TRT trustees had apparently discussed with SFREI the possibility that TMC would continue to manage the trust properties; it is reasonable to infer that the Gramlichs foresaw or at least believed that this relationship's

**16.** A somewhat more deferential standard has been applied where retention of control is the alleged basis for self-interest. *See, e.g., Panter v. Marshall Field & Co.,* 646 F.2d 271, 294 (7th Cir.) (impermissible motives must predominate), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Johnson v. Trueblood,* 629 F.2d 287, 293 (3d Cir.1980) (sole or primary purpose must be to retain control), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). This standard is considered appropriate where retention of control is an alleged motive since such a motive is virtually inherent in acts undertaken in opposition to a hostile bidder; thus, courts require more than an allegation of control as "a" motive for the director's acts, lest the business judgment rule be rendered meaningless in such circumstances. This rule, however, has been subject to less deferential application, *see Mobil, supra,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 92,284–85; *see also Norlin, supra,* at 265 (business judgment rule inapplicable where directors "shown to have a self-interest in the transaction at issue"), and has even been criticized for its leniency. *See Panter, supra,* 646 F.2d at 304 (Cudahy, J., dissenting); *Johnson, supra,* 629 F.2d at 301 (Rosenn, J., dissenting). In any event, because Missouri courts require a fairly convincing showing of fiduciary good faith, and since the alleged self-interest in this case is primarily the specific financial benefits arising from the sale

and liquidation transactions, evidence that this interest was a significant motivating factor underlying the trustees' conduct should be sufficient. *Cf. Klaus v. Hi-Shear Corp.,* 528 F.2d 225, 233–34 (9th Cir.1975); *Mobil, supra,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 92,-285 n. 55.

**17.** As of November 1980, John Gramlich owned 145 shares of TMC (30.5%), Michael Gramlich owned 145 shares (30.5%), and James Kostoryz (John Gramlich's brother-in-law) owned 35 shares (7.4%). John Gramlich was president of TMC and J. Russell Gramlich, his father, was Chairman of the Board. *See* Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Plaintiff's Brief"), at 6.

**18.** Additional circumstantial evidence of the Gramlichs' potential self-interest can be found in the decision of other trustees to hold a special meeting on February 5, 1981, one day before the sale to SFREI, "in the absence of J. Russell Gramlich and John J. Gramlich because the independent Trustees did not have a substantial interest in the Trust or Terrydale Management Corporation and therefore could be more objective with regard to the possible sale of assets and liquidation of the Trust, which were being considered by the Trustees." *See* Ex. C, SFREI's Requests for Admissions (minutes of 2/5/81 TRT Trustees meeting), at 15.

continuation was possible.[19] And although the amounts received by TMC prior to its termination as trust manager were admittedly less than that which it would have received had TRT continued in operation, the trustees may reasonably have foreseen a significantly more rapid termination of the TMC management agreement had BCG succeeded in gaining control of TRT. *See* Ex. A, SFREI's Requests for Admissions (BCG Offer to Purchase), at 11. The trustees' decision to sell the trust assets was apparently instrumental in defeating the BCG tender offer and thus avoiding immediate termination of the management agreement.[20] These circumstances and the reasonable inferences which can be drawn therefrom, combined with the motive or intent-based inquiry which is entailed in determining whether a director or trustee was sufficiently influenced by personal interests, create a triable issue of fact. *See Schwartz v. Marien*, 37 N.Y.2d 487, 335 N.E.2d 334, 373 N.Y.S.2d 122, 128 (1975). While we express no opinion as to the persuasiveness of this evidence of potential self-interested conduct or of defendants' evidence to the contrary, issues of fact nevertheless remain.

Plaintiff further alleges that the Gramlichs' decision to oppose the BCG offer and sell TRT assets to SFREI was influenced by a $890,872 loan obligation falling due on February 10, 1981.[21] Plaintiff has produced evidence that the Gramlichs had insufficient assets to pay off the loan (or that they would have had to utilize relatively illiquid personal assets in order to discharge the loan obligation) and that the sale of TRT shares held by the lender as collateral was subject to SEC Rule 144's restrictions on the sale either of securities by "affiliates" of the issuer or of "restricted securities." There is some evidence to indicate that the ability of the Gramlichs to satisfy the loan obligation may have been of some concern to the bank, *see* Plaintiff's Ex. 262 (letter from Mid-American Bank to

**19.** We thus reject defendants' contention that plaintiff essentially asks this Court to *presume* self-interest based on the existence of the TMC contract, a presumption which has been rejected with respect to a director's retention-of-control motive. *See Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 702–03 (2d Cir.1980). In *Crouse-Hinds*, the court rejected a claim of self-interest since the target directors had negotiated a merger with a white knight (and thus preserved their positions) prior to the announcement of the hostile tender offer. *Id.* at 703. The instant case is factually distinguishable.

In addition to submitting evidence in opposition to plaintiff's claim, defendants argue that the TRT shareholders' approval of the TMC management agreement precludes a finding of self-interest. Defendants refer to the TRT Proxy Statement, dated January 8, 1982, which discloses the amounts received by TMC during fiscal year 1981 in connection with its services as trust manager. However, this proxy statement does not establish the shareholders' approval of either the TMC contract or the sale to SFREI and simultaneous adoption of a liquidation plan; the proxy statement relates only to the creation of TLT and the selection of TLT trustees. In any event, plaintiff's claims of unfairness and self-interest, if established at trial, would appear to eliminate the effectiveness of shareholder ratification in the instant case. *See Saigh v. Busch*, 396 S.W.2d 9, 22 (Mo.Ct.App. 1965), *cert. denied*, 384 U.S. 942, 86 S.Ct. 1465, 16 L.Ed.2d 541 (1966).

**20.** We thus reject defendants' argument that the trustees, in voting to sell and liquidate the trust and thus eventually terminate the TMC/TRT relationship, cannot be found to have acted out of self-interest. As noted above, the trustees still could have reasonably foreseen that their decision would undermine, as it in fact did, the success of the BCG tender offer and thus insure the continuation of the TRT/TMC relationship for a considerable period of time; an unopposed offer would likely have led to a significantly more rapid termination of this relationship. In addition, defendants give insufficient weight to the fact that the sale itself generated substantial fees for TMC. We thus reject defendants' characterization of these financial advantages as merely temporary benefits. *Cf. Treadway, supra*, 638 F.2d at 387–88 (on petition for rehearing) (directors' pre-merger sale of stock to white knight not made for purpose of retaining control even though directors remained in office pending consummation of merger).

**21.** John Gramlich, together with his brother and brother-in-law, borrowed this amount in November of 1980 in order to pay for the acquisition of 36,737 TRT shares. These shares, along with an additional 25,000 TRT shares owned by J. Russell Gramlich, were held by the bank as security for the loan. *See* Plaintiff's Ex. 3.

John Gramlich, Sept. 25, 1980); the deposition testimony of John Gramlich does not dispel all doubt as to whether this sizable loan obligation influenced the Gramlichs in their decision to oppose the BCG offer and sell the trust assets. In addition, even if the collateralized shares were actually free of restrictions on their sale, it is presently unclear whether the Gramlichs were aware of this at the time of the challenged transactions. The existence of the loan obligation thus raises a triable issue of fact regarding the Gramlichs' alleged self-interest.

 Defendants argue that the Gramlichs' loan obligation cannot be a basis for a finding of self-interest since the liquidating dividends paid by TRT were distributed equally to all TRT shareholders. Defendants contend that many TRT shareholders may have had outstanding loan obligations and that the trustees and nontrustee shareholders were thus similarly benefitted by the decision to sell and liquidate. It is true that a finding of self-interest is not warranted where the allegedly special benefits are available to all shareholders. *See Buffalo Forge, supra,* 555 F.Supp. at 904. Here, however, defendants have failed to produce any evidence that other shareholders in fact had obligations of even remotely similar size and timing which could be satisfied by the payment of a liquidating dividend, or that the Gramlichs knew that this was indeed the case. *Cf. id.* (directors' approval of merger not based on self-interest in obtaining tax benefits where evidence showed that directors knew many shareholders would benefit from tax-free nature of transaction). Indeed, there is little reason to even presume that TRT shareholders were similarly saddled with sizable and imminent personal financial obligations, unlike the more generally applicable capital stock tax benefit in *Buffalo Forge.* Defendants' argument that TRT share dividends received by the Gramlichs would have been sufficient to pay the interest expense on the loan is also not dispositive. Even if defendants' argument is numerically accurate, the essence of plaintiff's claim of self-interest is based on the Gramlichs' desire to generate funds sufficient to liquidate the loan and thus avoid paying interest expense altogether. In short, we cannot presently conclude that the Gramlichs' loan obligation played no role in their decision to sell TRT assets and liquidate the trust.

 Plaintiff also alleges that J. Harlan Stamper was motivated by self-interest in his decision-making based on his membership in the law firm of Morris, Larson, King, Stamper & Bold, counsel to TRT. Plaintiff argues that Stamper's decision to oppose the BCG tender offer and to approve the sale and liquidation plan were tainted by the fact that his firm stood to preserve, at least temporarily, its relationship due to the former decision and receive substantial legal fees with respect to the latter. Defendants argue that these facts, as a matter of law, do not constitute self-interest. This Court has previously held, in related litigation, that the above facts were sufficient to demonstrate a "financial stake ... in the transaction" which prevented the other disinterested trustees' knowledge from being attributed to the trust in order to avoid a finding of deception. *See Bolton v. Gramlich,* 540 F.Supp. 822, 838–89 (S.D.N.Y.1982) (*quoting Maldonado v. Flynn,* 597 F.2d 789, 793 (2d Cir.1979)).[22]

**22.** In *Bolton,* this Court distinguished *Maldonado v. Flynn,* 597 F.2d 789 (2d Cir.1979), in which the Second Circuit held that a director appointed to an independent investigation committee was not "interested" simply because his law firm was counsel to the committee, a circumstance which supposedly may have "motivated him to curry favor" with the interested parties. On remand, the district court held that the fact that the law firm was to be paid for its work did not support an inference that the lawyer was "somehow predisposed to a particular determination of the matter before the Committee." *Maldonado v. Flynn,* 485 F.Supp. 274, 283 (S.D.N.Y.1980) (Weinfeld, J.) (implication dismissed as "a non sequitur and hardly worthy of comment"), *rev'd on other grounds,* 671 F.2d 729 (2d Cir.1982). Unlike *Maldonado,* however, where the firm apparently was to receive legal fees regardless of the committee's decision as to whether or not to discontinue a derivative action, Stamper stood to benefit only if the trustees voted to oppose the tender offer and, more

It is far from clear that this finding renders Stamper self-interested in the instant case *a fortiori*, given the differing purposes for which the determination of self-interest is being made. A director or trustee is not disloyal merely because he or she has an indirect financial interest in a particular transaction; disloyalty or lack of good faith is demonstrated by evidence that the fiduciary was improperly influenced by personal considerations or benefits not available to other shareholders generally. *See Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 702–03 (2d Cir.1980); pages 1018–1019 *supra.* Although the issue is a close one, we are presently unable to determine the extent to which this "financial stake" in fact influenced Stamper in his decision to oppose the BCG offer. Although the record reveals that Stamper appears to have given the transaction fairly thorough and objective consideration, the extent of financial benefit accruing to his firm as a result of the opposition to the BCG bid and the sale of assets to SFREI,[23] as well as his own recognition of potential self-interest, *see* Plaintiff's Ex. 14A, p. 86, create an issue of fact with respect to the possibility of self-interested conduct.[24]

▆▆▆ Finally, plaintiff claims that the independence and financial disinterestedness of trustees Stamper (to the extent he was not otherwise self-interested), Murphy, and O'Flaherty was overcome by the Gramlichs' domination and control of TRT. In order to sustain a claim of domination and control, a party must allege facts "manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'" *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984) (*quoting*

*Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del.Ch.1971)); *cf. McFarland v. Memorex Corp.*, [1979–1980 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 97,368, at 97,462 (N.D. Cal. May 14, 1980) ("[C]ontrol ... means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.") (*quoting* 17 C.F.R. § 230.405(f) (1984)). While mere stock ownership, without more, does not constitute domination and control, *see Aronson, supra*, 473 A.2d at 815–17 (directors who owned 47% of stock and who personally selected other directors did not dominate and control), plaintiff has produced sufficient evidence to create an issue of fact in this regard. Plaintiff has produced evidence that other trustees were quite concerned with the goals and interests of the Gramlichs, that they expressed reservations about the sale of TRT assets, that they were unaware of certain significant aspects of the sale to SFREI, and that these trustees believed that it was necessary to conduct (and did conduct, on February 5, 1981) a meeting in the Gramlichs' absence in order to consider the SFREI proposal. In addition, plaintiff notes that even at this meeting of "independent" trustees, the Gramlichs' attorney was present to represent their interests. In addition, plaintiff has produced evidence that this alleged dominating influence of the Gramlichs over trust management was simply a continuation of their prior influence over the trustees. *See* Plaintiff's Ex. 14A. This evidence is by no means overwhelming, particularly in light of the fairly thorough and objective consideration which the non-Gramlich trustees appear to have given the

specifically, if the trust assets were sold. *But cf. Panter, supra*, 646 F.2d at 294 (no inference of self-interest drawn where target company director's investment banking firm performed work for company).

23. Stamper's law firm was paid $215,188 during the year ended September 30, 1981 for general legal services performed for TRT and for services relating to the purchase and sale of TRT trust properties. It is unclear what portion of this amount was earned subsequent to the sale to

SFREI; nor is it clear whether, and to what extent, Stamper's firm earned fees subsequent to the above date.

24. As noted previously with respect to the Gramlichs, this Court cannot conclude at this stage that Stamper's knowledge that his decision would eventually lead to the termination of the TRT/law firm relationship precludes a finding of self-interested conduct. *See* fn. 20 *supra*.

SFREI transaction. The line between mere influence over other trustees and domination of trust management is not an easy one to demarcate. But in view of the factors discussed above, the determination of whether this line was crossed must be made at trial. *See Aronson, supra,* 473 A.2d at 815–16; *cf. Treadway, supra,* 638 F.2d at 383–84 (appeal of final judgment) (no claim nor any evidence of domination and control by self-interested director).

 Because the present record suggests potential self-interested conduct by a majority of the TRT trustees, *cf. Treadway, supra,* 638 F.2d at 383,[25] summary judgment cannot be granted based on the presumption of the business judgment rule. The Missouri state law standards of good faith and disinterestedness are fairly rigorous ones, and several bases for self-interest and disloyalty have been asserted. This Court's ability to resolve this issue would be enhanced by a factual inquiry into the extent to which the trustees' alleged financial interests and domination actually influenced their decisions to oppose the BCG tender offer, sell the trust assets to SFREI, and liquidate the trust.

 Assuming that plaintiff succeeds in demonstrating self-interested conduct by the trustees, the trustees must then demonstrate that the challenged transactions were fair and reasonable to TRT and its shareholders. There appears to be considerable variation among courts which have applied this general standard in the context of takeover battles, including a requirement that a compelling business purpose be demonstrated, *see Klaus v. Hi-Shear Corp.,* 528 F.2d 225, 233–34 (9th Cir.1975); a careful inquiry into the substantive fairness of the transaction, *see Mobil, supra,* [1981–1982 Transfer Binder] Fed.Sec.L. Rep. (CCH) at 92,274, 92,285; a search to determine the "independent legitimacy" of the transaction in addition to the alleged business purposes for opposing the tender offer, *see Norlin, supra,* at 265–267; and a search for a proper or rational business purpose for the transaction. *See Johnson v. Trueblood,* 629 F.2d 287, 292–93 (3d Cir. 1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *see also Treadway, supra,* 638 F.2d at 381. The instant case is also somewhat complicated in that the opposition to the tender offer consisted of the sale and liquidation of the target, rather than the mere securing of a higher bidder for the target's stock. While this fact by no means renders the transaction more suspect or inherently unfair, it requires this Court to consider a number of interrelated and potentially inconsistent factors in determining the fairness and reasonableness of the transactions at issue. In so doing, we will consider both the substantive fairness of the transactions as well as the purposes for which they were consummated.[26]

**25.** Plaintiff raises an additional basis for finding that the trustees acted in their own self-interest. In our view, it cannot withstand careful scrutiny. According to plaintiff, the Gramlichs alleged desire to oppose the BCG tender offer and thus avoid being "locked in as a minority" was apparently based on its concern that the marketability of their stock would be diminished as a consequence of possible delisting of TRT shares from the National Association of Securities Dealers Automated Quotation (NASDAQ) System, and on the possible loss of TRT's REIT status—the likely consequences of a successful BCG tender offer. These consequences, however, would have befallen *all* TRT shareholders who chose not to tender their shares; thus, the trustee and non-trustee shareholders' interests were consistent and legitimate in this respect. In addition, there is no evidence to indicate that additional restrictions on the sale of the Gramlichs' shares, *see* Plaintiff's Brief, at 12 (discussing restrictions imposed by SEC Rule 144 on sale of TRT shares by "affiliates" of TRT or of "restricted securities"), actually motivated the Gramlichs to approve the sale of TRT assets; such restrictions, assuming they in fact applied, presumably existed prior to the BCG offer and may well have continued to apply even after the sale to SFREI. Thus, to the extent that the above consequences are said to constitute an *independent* basis for finding self-interest, this argument is rejected.

**26.** Such an analysis is consistent with the rigorous standard of good faith and fair dealing imposed on directors under Missouri law, *see* page 1018 *supra;* there is also some authority suggesting that a valid business purpose will not shield directors from liability where the terms and other actions of the directors bespeak unfairness. *See Johnson v. Duensing, supra,* 351

Plaintiff's allegation of unfairness rests primarily on the purported "fire sale" prices at which the TRT assets were sold. Plaintiff has submitted evidence that the properties sold to SFREI had been reappraised, four days prior to the sale, at amounts far in excess of both the sales price and prior appraisals of the property;[27] that changes in real estate market conditions rendered the 1980 appraisals of TRT assets obsolete;[28] that an unexpired right of first refusal on the most valuable building significantly reduced the amount that TRT could obtain for its sale at the

S.W.2d at 32 (directors' sale of treasury stock undertaken to raise working capital held a breach of fiduciary duty where sale enabled the sellers and buyers to acquire majority ownership, was made at price below fair market value, and was made without effort to obtain highest possible price for stock). In addition, the rational business purpose standard has been the subject of some dispute, namely, that such a standard effectively reapplies the deference of the business judgment rule even where the rule has presumably been rendered inapplicable and the burden of demonstrating fairness shifted to the directors. See, e.g., Note, Protecting Shareholders Against Partial and Two-Tiered Takeovers: The "Poison Pill" Preferred, 97 Harv.L.Rev. 1964, 1969–70 (1984); Note, The Misapplication of the Business Judgment Rule in Con-

tests for Corporate Control, 76 Nw.U.L.Rev. 980 (1982); see also Wirth Introduces Bills to Limit Tender Offer Abuses, [Current] Sec.Reg. & L.Rep. (BNA) No. 21, at 913 (May 25, 1984) (proposing legislation requiring target management to demonstrate that anti-takeover conduct was "prudent for the issuer and fair to shareholders"); cf. Norlin, supra, at 265–267. In light of the above factors, the fact that TRT is a business trust rather than a corporation (a distinction of uncertain import under Missouri law in these circumstances), and the procedural posture of the instant case, we are reluctant to accord undue deference in reviewing the propriety of the challenged conduct.

27. Plaintiff provides the following information about the value of the properties involved (in thousands):

| | Selling Price | Fair Market Value | Terrydale Equity at Selling Price | Terrydale Equity at Fair Market Value |
|---|---|---|---|---|
| Lincoln Tower Bldg. | $14,134 | $26,720 | $ 8,138 | $20,720 |
| Petroleum Building | 6,713 | 13,350 | 4,354 | 10,990 |
| Century Bank Building | 7,605 | * | 2,186 | ** |
| Travelers Building | 2,845 | 4,860 | 2,420 | 4,435 |
| Totals | $31,297 | $52,535 | $17,098 | $38,331 |

\* in excess of $7,605.
\*\* in excess of $2,186.

Complaint at ¶ 12.

Plaintiff contends that the subsequent sale of the same equity interest in the Lincoln Tower Building for $18,400,000, over 100% more than TRT received approximately one and a half years earlier (when real estate values were allegedly higher), illustrates the sacrifice that TRT incurred in selling the trust assets to SFREI.

28. These appraisals were as follows:

| | Appraiser | Date | Value (in thousands) |
|---|---|---|---|
| Lincoln Tower Building | Blaine B. Chase & Co. | 6/1/80 | 14,134* |
| Petroleum Building | Van Court & Co. | 10/13/80 | 6,713 |
| Century Bank Building | Gunther & Associates | 1/1/81 | 7,605 |
| Travelers Building | Van Court & Co. | 5/19/80 | 2,846 |
| Total | | | $31,298 |

\* includes $3,854,000 wraparound mortgage due TRT.

time of the BCG offer; and that the trustees could foresee significant increases in the value of TRT assets at the time the property was sold. Plaintiff also suggests alternative courses of action which, in its view, would have been far more reasonable and profitable for TRT and its shareholders.[29]

Defendants offer an abundance of reasons in justification of the trustees' acts. Primary among them are: (1) the potential loss of TRT's favorable tax status as a REIT had the BCG tender offer been successful; (2) the potential loss of TRT's share listing on NASDAQ (and thus a decline in marketability and value); (3) the shareholders' loss of the benefit of reporting and disclosure provisions of the Securities and Exchange Act;[30] (4) the favorable comparison of the liquidating dividends paid to *all* TRT shareholders, totalling $33.50, with either the BCG tender offer of $33.50 for approximately 34% of the TRT shares, or any other offer for TRT shares or assets; (5) the relative ineffectiveness of trustee passivity, *i.e.*, merely recommending that shareholders not tender their shares to BCG;[31] and (6) a fervent objection to plaintiff's method of valuing TRT's assets as of February, 1981.[32]

We do not believe the issues raised by the parties can properly be resolved at this stage of the litigation. Of primary concern is the dispute surrounding the value of TRT assets both at the time of sale and for the then-foreseeable future. While perhaps it is not necessary to determine the precise value of TRT assets as of February 6, 1981 in order to properly resolve the fairness and reasonableness issue, *cf. Mobil, supra,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 92,274 (denial of preliminary injunction), plaintiff has produced evidence suggesting that the sale of TRT assets occurred at a price and time which rendered the transaction seriously deficient from an economic viewpoint. *Cf. Bolton v. Gramlich, supra,* 540 F.Supp. at 840 n. 25. Resolution of the factual disputes surrounding the value of TRT assets is of significant consequence to plaintiff's claim and cannot properly be decided at this time.[33]

29. Implicit in plaintiff's argument is the claim that the success of the BCG tender offer and continuation of TRT as an operating business trust would have been far more favorable than the sale and liquidation of TRT.

30. These three risks were disclosed in BCG's Offer to Purchase. *See* Defendants' Ex.A, SFREI's Requests for Admissions, at 3, 5.

31. Defendants also argue that the trustees could not be certain that BCG management, had it gained control of TRT, would have acted in such a way as to enable TRT shareholders to enjoy the benefits of any increase in real estate values. This implicit questioning of BCG's intent is speculative, disputed by plaintiff, and is in no way dispositive of the fairness and reasonableness issue. *See Norlin, supra,* at 267.

32. Defendants offer evidence of (1) the use of incorrect capitalization and rental rates and the drawing of improper comparisons of dissimilar buildings in Blaine Chase's preliminary revaluation of trust property; (2) testimony of Blaine Chase downplaying the significance of his calculations; (3) plaintiff's misplaced reliance on appraisals conducted almost one and two years after the sale to SFREI, and (4) the relative instability of the Denver real estate market at the time of sale.

33. Defendants strongly dispute plaintiff's suggestion that the trustees could have sold the TRT assets "in an orderly fashion ... not operating under the time constraints" of the BCG tender offer. Plaintiff's Brief, at 69. Although defendants may well be correct, this does not remove all factual dispute as to whether the trustees' decision to sell the assets in the manner and for the amount they did was fair and reasonable as a matter of law. In this regard, plaintiff has produced evidence suggesting that the trustees' inability to obtain full value for the property may have been attributable to the significant risks associated with the purchase of at least two of the Denver buildings, namely, outstanding rights of first refusal which could not be satisfied prior to the consummation of the sales transaction, as well as the inability to find a buyer with the necessary cash at that time.

Defendants also argue that the trustees' power "[t]o determine conclusively the value of all or any part of the Trust property" and "to revalue" such property, *see* TRT Declaration of Trust, Art. III, § 2(r), effectively bars plaintiff's claim. Notwithstanding this legal power, however, the trustees cannot escape the power of an equity court to determine whether their sale of trust property was so unfair and for such improper motives (or tainted by sufficient self-interest) that it constituted a breach of fiduciary duty.

Plaintiff also raises factual questions with respect to the significance of other factors surrounding the BCG tender offer. The effect of TRT's loss of REIT status is unclear, in light of the decreased earnings and anticipated losses and increased expenses of TRT both before and after the sale, *see, e.g.,* Plaintiff's Ex. 2, 291; *see also* Plaintiff's Reply, at 30 (noting five-year renewal of leases for 40% of Lincoln Tower Building space at rates well below fair rental value), the trustees' own uncertainty regarding the significance of REIT status, *see* Plaintiff's Ex. 14A, and the fact that other tender offers were considered which involved the same potential for loss of REIT status, *see* Plaintiff's Ex. 486.[34] In addition, the fact that the potential consequences of a BCG tender offer were thoroughly considered by the trustees is not dispositive of our inquiry; if the presumption of good faith and disinterestedness is overcome, our task will be to evaluate not only the purposes for which the trustees acted but the fairness of the transactions themselves. *See Norlin, supra,* at 267 n. 13; *Mobil, supra.*[35]

We recognize the reluctance of courts to intrude into the decision-making processes of business fiduciaries faced with developments of major import which demand fairly immediate response. Nevertheless, several considerations weigh against resolution of the breach of fiduciary duty issue at this preliminary stage. The disparity in price and fair market value asserted by plaintiff distinguishes this case from others in which directors' decisions in response to tender offers were found to be fair and reasonable. *Cf. Buffalo Forge, supra,* 555 F.Supp. at 905 (sale of treasury stock); *Mobil, supra,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 92,274 (granting of stock and asset purchase options). The extraordinary nature of the instant transactions also supports a determination made only after the aforementioned factual issues are resolved. *Cf. Joseph E. Seagram & Sons, Inc. v. Abrams,* 510 F.Supp. 860 (S.D.N.Y.1981) (issuance of temporary restraining order enjoining directors from liquidating company in response to unsolicited tender offer). Finally, we recognize that the principal cases in which courts have upheld directors' responses to hostile takeover bids have been decided in circumstances where findings of fact were first made.[36] While defendants may ultimately succeed in demonstrating the propriety of the TRT trustees' conduct, we are presently unwilling to conclude that Missouri courts would refuse, as a matter of law, to hold the trustees liable under the circumstances of the instant case.

**34.** It is unclear from the record before us what the financial consequences would have been had the TRT shares been relegated to simple over-the-counter, as opposed to NASDAQ-reported, status. *See generally* Defendants' Ex.A, SFREI's Requests for Admissions (BCG Offer to Purchase), at 5.

**35.** Defendants argue that the trustees' reliance on the advice of counsel bars plaintiff's claim. The TRT Declaration of Trust specifically provides, however, that the opinion of counsel "shall be full and complete authorization and personal protection in respect of any action taken or suffered by [the trustees] *in good faith* and in accordance with such opinion." TRT Declaration of Trust, Art. III, § 15 (emphasis added). Plaintiff's claim of self-interested conduct is clearly inconsistent with the protection afforded by this provision. In addition, the trustees relied on the advice of Stamper, who is allegedly a self-interested trustee, and Jerry Shulman, whose advice did not address the consequences of self-interested conduct by the trus-

tees. *See* Shulman Deposition, at 115 (advising trustees that it was within their discretion to "sell and liquidate at what they considered to be fair market value."). We also reject defendants' argument that the TRT Declaration of Trust, Art. III, § 17, which provides that "any act of the Trustees purporting to be done in their capacity as such ... shall, as to other Persons dealing with such Trustees ... be conclusively deemed to be within the purposes of the Trust and within the powers of the Trustees," insulates SFREI from the power of an equity court to hold it accountable as a constructive trustee if SFREI is found to have had notice of the trustees' breach of duty. *See* pages 1031–1033 *infra*.

**36.** *See Buffalo Forge, supra* (appeal of judgment); *Panter, supra* (appeal of directed verdict); *Treadway, supra* (appeal of judgment); *Crouse-Hinds, supra* (appeal of granting of preliminary injunction); *Johnson v. Trueblood, supra* (appeal of judgment); *Mobil, supra* (denial of preliminary injunction).

### b. *Knowledge*

In order to sustain a claim of aiding and abetting, plaintiff must demonstrate evidence of SFREI's knowledge of wrongdoing by the TRT trustees. Actual knowledge of a breach of duty is required; mere suspicion or even recklessness as to the existence of a breach is insufficient. *See Marine Midland Bank, supra,* 482 F.Supp. at 1290 (breach of fiduciary duty); *Kransdorf, supra,* 582 F.Supp. at 337–38 (fraud and mismanagement); Restatement (Second) of Torts § 876, Comment on Clause (b); *cf. Harmsen v. Smith,* 693 F.2d 932, 943 (9th Cir.1982) (securities law), *cert. denied,* —— U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Edwards & Hanly, supra,* 602 F.2d at 485 (same). The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one. Especially where the alleged aider and abettor owes no fiduciary duty to, or has no confidential relationship with, the injured party, *cf. Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975); *H.L. Federman & Co. v. Greenberg,* 405 F.Supp. 1332, 1336–37 (S.D.N.Y.1975), liability cannot be imposed absent a showing that the defendants had actual knowledge of tortious conduct by the primary wrongdoer. In this connection, it is important to recognize that the nature of liability sought to be imposed with respect to this claim is not merely the return of the TRT assets sold to SFREI, *cf.* pages 1031–1033 *infra,* but affirmative monetary relief for SFREI's role in the alleged wrongdoing. Actual knowledge, not mere notice or unreasonable unawareness, is therefore essential. *See Metge v. Baehler,* 577 F.Supp. 810, 824 (S.D.Iowa 1984) (summary judgment) (inference that party had strong suspicion of other party's fraud not sufficient to support inference of actual knowledge); *Wright v. Schock,* 571 F.Supp. 642, 663 (N.D.Cal.1983) (allegation that bank "must have known" of broker's alleged securities fraud insufficient to defeat summary judgment motion on aider and abettor claim).[37]

Plaintiff must produce evidence of SFREI's knowledge not only of the objective unfairness and unreasonableness of the instant transaction, but also of facts and circumstances demonstrating that the trustees acted in furtherance of their own self-interest. Even under the stringent standards of summary judgment, plaintiff has failed to produce evidence creating a genuine issue of fact on this issue. It may be conceded that SFREI may have known of the Gramlichs' interest in TMC and of their efforts, through negotiations with Unicorp and SFREI itself, to maintain it. It may be conceded, though the evidence is relatively sparse, that SFREI had similar knowledge with respect to the Gramlichs' loan obligation.[38] Whether or not SFREI

**37.** Plaintiff contends that, as a matter of common law, a showing of recklessness should be sufficient to establish the element of knowledge. *See* Plaintiff's Brief, at 86 (citing *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 45 (2d Cir.) (aiding and abetting securities fraud) ("at common law, reckless conduct is viewed as a form of knowing conduct") (citing W. Prosser, Handbook of the Law of Torts § 107 (4th ed. 1971), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978)). Prosser's discussion, however, relates to the tort of misrepresentation, not to the imposition of secondary aider and abettor liability for one's role as a purchaser in an allegedly tortious sales transaction. In addition, the use of a recklessness standard in securities cases is limited to those situations in which the alleged aider and abettor owes a fiduciary duty to the plaintiff. *See Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *Rolf, supra,* 570 F.2d at 44. The more highly regulat-

ed nature of securities transactions and the more clear-cut nature of securities violations in aider and abettor cases also support the imposition of a lower standard of knowledge than is appropriate here; the concern in these cases is typically with the relative degree of involvement of peripheral parties (*i.e.,* brokers, banks, accountants) to the fraud, not the ambiguous nature of the fraud itself. Finally, plaintiff cites no cases, nor can we find any, that have imposed or even considered a claim of aider and abettor liability on a showing of less than actual knowledge of wrongdoing in circumstances where the considerations noted in text are present.

**38.** The evidence suggests only that SFREI knew of the Gramlichs' loan obligation; there is no evidence indicating that SFREI knew of the Gramlichs' inability to satisfy this obligation by

knew of the Gramlichs' alleged self-interested conduct, however, the evidence fails to establish any genuine basis for finding that SFREI knew of Stamper's alleged self-interested conduct or of the Gramlichs' domination of the other trustees. Although SFREI apparently knew that Stamper's law firm performed legal services for TRT, they knew of neither his own ambiguous expression of potential conflict-of-interest, nor of his alleged interest in selling TRT assets rather than obtaining a tender offer for TRT shares. Indeed, the financial benefits received by Stamper's law firm incident to the sale of TRT assets were the result of SFREI's own inability to engage in a tender offer for TRT shares.[39] We recognized earlier that Stamper's alleged self-interest presented a difficult question, and was predicated on inferences which, under somewhat similar circumstances, have been firmly rejected. *See* pages 1021–1022 *supra.* Even assuming such self-interested conduct could conceivably be shown, SFREI's actual knowledge of this is simply not supported by evidence in the record.

A lack of evidence similarly undermines plaintiff's claim that SFREI knew of the Gramlichs' domination and control. While SFREI knew that TMC managed TRT properties and that TMC was owned primarily by the Gramlichs, no showing has been made that SFREI knew of the Gramlichs' domination and control of the other trustees in their conducting of trust business. The record fails to indicate SFREI's awareness of any of the aforementioned factors which give rise to factual issues regarding

domination and control. *See* pages 1022–1023 *supra.* Although the determination of whether domination and control by the Gramlichs in fact occurred will depend in significant part on the trustees' own impressions of the manner in which trust business was conducted, there is no evidence indicating that SFREI had actual knowledge of the existence of such domination. As noted previously, whether SFREI should have realized this possibility or was perhaps unreasonable in failing to recognize it is relevant only to SFREI's potential restitutional duty to plaintiff, not to SFREI's potential liability as an aider and abettor. Thus, even if reasonable inferences could support a finding that SFREI actually knew of the Gramlichs' various self-interested motives for their conduct, similar inferences with respect to the non-Gramlich trustees are far too attenuated to create a genuine factual issue.

 Absent knowledge of self-interested conduct by a majority of the TRT trustees, SFREI's actual knowledge of the alleged unfairness of the challenged transactions is insufficient to subject it to aider and abettor liability. In any event, the voluminous submissions of both parties fail to create a genuine issue regarding SFREI's alleged knowledge of the unfairness and lack of business purpose surrounding the sale and liquidation transactions. SFREI may have believed (though they strongly dispute) that the trustees were exercising poor business judgment; such a possibility, however, is insufficient to establish knowledge of all the necessary

---

using their own personal assets or the collateral held by the bank. Nor is there evidence indicating that SFREI was aware of the bank's expression of concern with respect to the bank's ability to sell, if necessary, the TRT shares held as collateral.

39. Defendants have produced uncontradicted evidence that the structuring of the TRT/SFREI transaction as a sale, rather than a tender offer, was due to limitations in SFREI's own Declaration of Trust. Thus, even if Stamper may have nevertheless been motivated to *sell* the TRT assets, rather than solicit a tender offer superior to the BCG offer, in order to earn legal fees on the sale, *see* pages 1021–1022 *supra,* the record

fails to indicate that SFREI actually knew that Stamper's motive for structuring the transaction as a sale of assets was a financially self-interested one. That SFREI should have realized this possibility is also contradicted by the fact that TRT's prior negotiations with Unicorp, SFREI's part-owner, contemplated a tender offer rather than an asset acquisition. *See* Plaintiff's Ex. 486. In any event, whether SFREI should have known of the trustees' alleged self-interested motives with respect to the challenged transactions is a question of fact which need not be resolved in order to dispose of plaintiff's aider and abettor claim.

elements of the breach of duty alleged in the instant case. Plaintiff's evidentiary submissions suggest that SFREI had a strong basis for believing that the 1980 appraisals were obsolete, knew that the transaction was extremely favorable for SFREI, knew that the purchase of properties with outstanding rights of first refusal was unusual and would have resulted in a discounted selling price, and was aware of the generally favorable trend in real estate values at the time (the benefit of which was being taken from TRT shareholders). Defendants have countered with evidence indicating that SFREI knew of the many legitimate reasons for opposing the BCG tender offer—risks which were expressly disclosed in BCG's Offer to Purchase, that it knew its offer to purchase TRT assets was higher, on a per share basis, than any other offer for TRT properties or shares, and that it believed the price paid for TRT assets was reasonable in view of the other offers that had been made, the various risks associated with the acquisition of the property which may have impeded its market value (*i.e.*, "due on sale" provisions, necessary renovations, long-term leases at unfavorable rental rates), and the alleged instability of the Denver real estate market at the time. In addition, plaintiff does not allege that defendants had any knowledge of the February 2, 1981 revaluations of TRT assets which were computed at the TRT trustees' request. The above evidentiary submissions are by no means incon-

sistent or irreconcilable, but this very fact reveals the inadequacy of plaintiff's actual knowledge claim: even assuming plaintiff's assertions are true, defendants' uncontradicted assertions establish the basis for its belief in the reasonableness of the transaction from TRT's point of view. Whether one set of factors noted above should have prevailed over the other in the minds of SFREI trustees is relevant only to whether SFREI should have been aware of the possible unfairness of the transaction; it does not, however, establish the requisite knowledge for aider and abettor liability. *Cf.* Restatement (Second) of Torts § 876, Comment on Clause (b) (aider and abettor liability imposed where person "knowingly gives substantial aid to another who, as he knows, intends to do a tortious act").[40]

■ In addition to the above analysis, several other considerations reveal both the potentially far-reaching consequences and general inappropriateness of imposing aider and abettor liability in these circumstances.[41] Primary among them is the indisputable fact that no duty, fiduciary or otherwise, existed between the parties in the instant case. Indeed, SFREI had a duty to its own shareholders to aggressively pursue economically favorable transactions, rather than shield or warn TRT shareholders of the consequences of their own trustees' decisions. *Cf. Grumman Allied Industries, Inc. v. Rohr Industries,*

**40.** Nor is it relevant that SFREI believed that it may have been acquiring TRT assets at an excellent price. What is relevant is whether TRT's sale of the assets, in the face of an unsolicited tender offer bid with potentially troubling economic consequences for TRT shareholders, constituted a breach of fiduciary duty by TRT trustees. Plaintiff's argument that SFREI's receipt of trust assets on favorable terms constitutes evidence of SFREI's knowledge of the trustees' alleged breach of fiduciary duty is simply a *non sequitur.*

**41.** A number of these considerations could also be just as easily ascribed to the "substantial assistance" element of aider and abettor liability. *See IIT v. Cornfeld, supra,* 619 F.2d at 922. In light of our above conclusion, we need not analyze in detail this element of aider and abettor liability. We do note, however, that this

Court has not yet resolved this issue, *cf. Terrydale Liquidating Trust v. Gramlich, supra,* 549 F.Supp. at 531 (participation in sale did not substantially assist dissemination of allegedly misleading press release), and that the securities law cases cited by defendants do not answer the question of whether a purchaser's participation in an allegedly tortious sales transaction constitutes substantial assistance. And while we recognize that the knowledge and substantial assistance elements are related, *see IIT v. Cornfeld, supra,* 619 F.2d at 922, it appears that the difficulty in the instant case lies primarily in SFREI's lack of actual knowledge of wrongdoing, rather than in the fairly objectively determinable degree of its participation. *See generally* Restatement (Second) of Torts § 876, Comment on Clause (b) (1982) (discussing factors for evaluating degree of assistance).

*Inc.*, 748 F.2d 729, 739 (2d Cir.1984) (seller of $55 million worth of assets has no duty to disclose material facts to buyer since parties had no fiduciary relationship). The absence of such a duty distinguishes this case from many in which aider and abettor liability has been alleged and supports the imposition of the stringent actual knowledge requirement. *See Armstrong, supra,* 699 F.2d at 91; *see also Landy, supra,* 486 F.2d at 162–63 (citing Restatement definition); *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 533–34 (S.D.N.Y.1977). In essence, plaintiff seeks to impose affirmative liability on business managers who, at worst, may have failed to reasonably exercise their own business judgment in evaluating the benefits and risks of a particular commercial transaction to shareholders of the other contracting party, where absolutely no fiduciary duty or confidential relationship existed between these managers and the allegedly injured shareholders. The record simply does not raise a genuine issue as to the presence of the significantly higher degree of culpability which is necessary to impose aider and abettor liability in the instant case.

▬ The nature of wrongdoing alleged in this case also supports a requirement that a party actually know that a breach of fiduciary duty is intended and consummated. Transactions which may appear reasonable at the time they are entered into may, upon more considered and deliberate reflection, prove to be objectively unreasonable. However, to impose affirmative liability on a purchaser in a commercial transaction without concrete evidence of both its knowledge of the self-interest or bad faith of the seller and its unavoidable awareness of the transaction's substantive unfairness or lack of business purpose would disrupt commercial activity in a manner wholly inconsistent with the purposes of aider and abettor liability. *Cf. Woodward, supra,* 522 F.2d at 97 (aiding and abetting securi-

ties fraud) ("[T]he knowledge requirement implicates the type of document labelled a security. Where, as in this case, the conclusion that a security even exists is highly questionable, the assistance must be clearly and intentionally directed toward aiding the fraud. Any other rule would wreak havoc with all commercial relationships, a result we do not desire."); *IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980) (existence of knowledge element depends on theory of primary wrongdoing). The facts and permissible inferences may support a finding that SFREI should have been alert to the possibility of self-interest or unreasonably ignored this possibility; to interpret such facts as a basis for inferring actual knowledge of improper motives and objective unreasonableness would impose a burden of second-guessing on parties such as SFREI which is wholly unwarranted in the context of commercial transactions. While an unreasonable disregard or constructive notice of facts constituting a breach of duty may support an equitable restitutional obligation in these circumstances, the policies underlying such a duty do not justify, at least in these circumstances, the imposition of a duty in tort giving rise to civil liability. *See Armenian Hotel Owners, Inc. v. Kulhanjian,* 96 So.2d 146 (Fla.1957).[42]

▬ Finally, the transaction at issue involved no facially or overtly illicit benefit to SFREI which might enable this Court to infer actual knowledge of a breach of duty by the TRT trustees. *Cf. IIT v. Cornfeld, supra,* 619 F.2d at 921–22. The alleged disproportion between property value and purchase price, even if demonstrated at trial, was simply of a different character— the fruits of an arm's-length commercial transaction in which the alleged aider and abettor had an independent duty to obtain the most favorable terms. In addition, this is not a case in which the disparity in price is so overwhelming and absence of legit-

---

**42.** In *Kulhanjian,* a minority stockholder sued for an accounting and damages based on the directors' alleged fraudulent assignment of the corporation's leasehold interest in hotel property, its principal asset. The court held that the assignee's participation was a sufficient basis for holding him accountable as a constructive trustee; the court explicitly refused, however, to hold him liable for damages.

imate business purpose so evident that knowledge of irregularity can reasonably be presumed. *Cf. Norlin, supra,* at 264–268 (incumbent directors' creation of director-controlled ESOP and issuance of corporate stock to ESOP, effectively giving directors voting control over nearly a majority of corporation's shares, likely constitutes breach of fiduciary duty since no real consideration received by corporation for newly issued shares and ESOP created solely to preserve directors' control).

Finally, the circumstances in which the challenged conduct occurred further illustrates the inappropriateness of imposing aider and abettor liability in this case. Courts have been loath to impose liability on business managers for acts taken in response to hostile takeover attempts. The reluctance to impose similar liability on non-fiduciary third parties in such circumstances is at least as compelling. Defendants have produced plentiful evidence of SFREI's knowledge of both the benefits to TRT of the challenged transactions and the negative consequences of a successful BCG tender offer. Plaintiff's factual submissions, even favorably viewed, fail to support the conclusion that SFREI not only acted unreasonably in its evaluation of the reasonableness of these transactions but

also actually knew that the precise opposite was true.

In sum, given the absence of genuine factual issues, and in view of the aforementioned considerations, the imposition of the potentially drastic and far-reaching liability sought in the instant case is totally unwarranted. Accordingly, defendants' motion for summary judgment with respect to plaintiff's aider and abettor liability claim is granted.[43]

### 2. *Duty of Restitution*

Plaintiff's attempt to impose a duty of restitution on SFREI is predicated on two grounds.

First, plaintiff seeks to hold SFREI accountable pursuant to the equitable rule that a purchaser of property takes it subject to a duty of restitution if the purchaser has *notice* that the transfer by the seller constitutes a breach of fiduciary duty. *See, e.g., Wallace v. Malooly,* 4 Ill.2d 86, 122 N.E.2d 275, 282 (1954); *B.J. McAdams, Inc. v. Boggs,* 439 F.Supp. 738, 752 (E.D.Pa.1977); Restatement of Restitution § 201 (1937). A party has notice of a breach of duty if it knows or should know that such a breach has been committed. *See* Restatement of Restitution § 174; *cf.* Restatement (Second) of Trusts § 297(a) (1959).[44] As we have already noted, issues

---

**43.** Courts have not hesitated to grant summary judgment where no genuine factual issues exist as to the elements of aider and abettor liability. *See, e.g., Cleary v. Perfectune, Inc.,* 700 F.2d 774 (1st Cir.1983); *Metge v. Baehler,* 577 F.Supp. 810, 820–25 (S.D.Iowa 1984); *Wright v. Schock,* 571 F.Supp. 642, 663 (N.D.Cal.1983); *Marine Midland Bank, supra,* 482 F.Supp. at 1290.

**44.** The Restatement (Second) of Trusts provides a useful multifactor test for determining whether a party should have known of another's breach of trust. *See* Restatement (Second) of Trusts § 297, Comment a (1959):

Among the circumstances which are or may be of importance are the following: (1) whether he knows that the person with whom he is dealing is in fact a trustee; (2) the extent to which he has reason to believe that the person with whom he is dealing is or may be a trustee . . .; (3) the character of the property dealt with, whether it is land or a chattel or a chose in action, negotiable or non-negotiable; (4) whether the transaction is one in the ordinary course of the business of the trustee; (5)

whether the trustee is disposing of the property for much less than its real value; (6) whether the third person knows or has reason to believe that the trustee is dealing with the property for his own benefit; (7) whether the third person is purchasing the property or engaging in some other transaction with the trustee, as for example where he is making a payment or conveyance to the trustee . . . or is acting as depository of trust funds . . . or is a corporation registering a transfer of securities . . . or is engaged in some other dealings with the trustee. . . .

Although we recognize that this Restatement is restricted in its application to ordinary personal trusts, *see id.* § 1, Comment 6, the standards governing both restitutional duty, *see id.* § 288, and notice, *see id.* § 297, are similar to those of the Restatement of Restitution discussed above. *See* pages 1031–1032 *supra.* This multifactor test thus provides appropriate and helpful guidance in resolving the issue of notice.

of fact remain with respect to the breach of fiduciary claim. *See* pages 1018–1027 *supra.* It would also be premature to decide whether SFREI should have known of the trustees' alleged self-interest and the substantive unfairness of the transaction to TRT. Both parties have produced evidence which, if uncontroverted, indicates either that SFREI had reason to suspect such a breach of duty or that SFREI had a reasonable belief that the trustees were entirely justified in their actions. This determination can best be made after the factual issues surrounding the alleged breach of fiduciary duty are resolved at trial.

Second, plaintiff argues that the TRT trustees' purported authorization of both the sale and liquidation was ineffective and in violation of the TRT Declaration of Trust. Because the trustees were allegedly "interested" in the sale and liquidation, plaintiff argues that they were unable to exercise the voting power which was necessary to effectuate these transactions. SFREI's notice of such trust violations, it is argued, renders it liable as a constructive trustee of the transferred property.

The TRT Declaration of Trust states that a decision to liquidate the trust must be approved by either a majority vote of the shareholders "or by the unanimous action of all of the Trustees in office." TRT Declaration of Trust, Art. VI, § 1. The Declaration of Trust also provides that "all ... transactions in which any [Trustee, officer or manager has] any direct or indirect interest shall be approved by a majority of the Trustees, including a majority of the Trustees who are not Affiliated with the Manager." *Id.* Art. III, § 14.

▇▇▇ Resolution of plaintiff's claim requires a distinction to be drawn between the potentially self-interested motivations of trustees which subject them to liability for breach of fiduciary duty and the direct interest in a transaction which disqualifies them from voting. Regardless of whether trustees were improperly motivated, for financial reasons or otherwise, to approve the sale and liquidation and thus are to be deprived of the good faith presumption of the business judgment rule, this potential for self-interest is insufficient to deprive the trustees of their contractual or legal power to vote. Plaintiff's authorities establish only the equitable rule disqualifying directors or trustees from voting in matters in which their interests are directly adverse to those of the corporation or trust, where the voting fiduciary is a party to the very transaction requiring fiduciary approval. *See, e.g., Weiss Medical Complex, Ltd. v. Kim,* 87 Ill.App.3d 111, 42 Ill.Dec. 250, 254, 408 N.E.2d 959, 963 (1980) (director disqualified from voting to remove restrictive covenant from employment contracts, including his own); *Gieselmann, supra,* 443 S.W.2d at 134–36 (director disqualified from voting to issue stock to himself and to cause corporation to pay him for legal services which he rendered to it); *Von Schrader v. Cornet,* 3 S.W.2d 706 (Mo.1927) (beneficiary unable to authorize his purchase of land from trustees); *Hill v. Rich Hill Coal Min. Co.,* 119 Mo. 9, 24 S.W. 223 (1893) (sale of land by director to corporation); *Christy v. Laclede-Christy Clay Products Co.,* 253 S.W. 106, 107 (Mo.Ct.App.1923) (director disqualified from voting against abolishing his status as corporate officer); 16A Fletcher Cyclopedia of the Law of Private Corporations § 8257, at 619 (R. Eickhoff rev. ed. 1979) ("generally speaking, a trustee's personal adverse interest disables him to vote in matters affected thereby") (citing case involving business trustee's attempt to approve trust's payment of claim to himself). A comparable transaction in the instant case—for example, a trustee voting to increase his compensation for trustee services rendered—would be barred under this principle. *See* Ex.B, SFREI's Requests for Admissions (minutes of 1/19/81 TRT Trustees meeting), at 14 (noting abstention of trustees Murphy and O'Flaherty from vote to increase their compensation). Unless otherwise specifically provided, however, the trustees' indirect receipt of financial benefits pursuant to preexisting, previously authorized contractual relationships is not the type of interest which disqualifies

them from voting on trust matters.[45] In any event, the Declaration of Trust provides its own specific limitation on trustee approval of sales transactions in which such indirect interests exist: these transactions require majority approval, including a majority of non-Gramlich trustees. *See* TRT Declaration of Trust, Art. III, § 14.[46] Since the Gramlichs did have an "indirect" interest in the sale to SFREI, this transaction required the approval of three of five trustees, including two affirmative votes from among trustees Stamper, Murphy, and O'Flaherty.[47] All trustees voted to sell the TRT assets to SFREI. Whether the affirmative votes of the non-Gramlich trustees were legally effective and valid, however, will depend on whether plaintiff can establish its claim of domination and control by the Gramlichs. The existence *vel non* of domination and control, and of SFREI's notice of same,[48] involve factual determinations which prevent this Court from presently resolving the merits of plaintiff's restitutional claim.

Accordingly, both plaintiff's and defendants' motions for summary judgment with respect to SFREI's restitutional liability are denied.

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is granted in part and denied in part, and plaintiff's motion for partial summary judgment is denied.

SO ORDERED.

---

**45.** *Bolton v. Gramlich, supra,* is not to the contrary. In *Bolton,* this Court held that a trustee's financial stake in the SFREI transaction prevented him from being "disinterested" for purposes of determining whether there existed a sufficient number of disinterested trustees whose knowledge could be attributed to the trust in order to avoid a finding of trust deception under the securities laws. *Id.* at 838–39. The decision indicates, however, that this determination was not relevant to a determination of the trustees' legal voting power under the Declaration of Trust. *Id.* at 839 n. 24 ("In this derivative action under Rule 10b–5, we are concerned with whether the trust was deceived, not with whether the actions were properly. authorized by the vote.").

**46.** Although the intended scope of this provision is not absolutely clear, we reject defendants' proffered interpretation of § 14. *See* Defendants' Reply Memorandum of Law, at 75–76.

Defendants simply ignore the second paragraph of § 14 quoted previously in text, instead focusing solely on the first paragraph dealing with purchases and sales of assets between the trust and the trustees. The interpretation described in text is consistent with this Court's prior interpretation of the clause. *See Bolton v. Gramlich, supra,* 540 F.Supp. at 838.

**47.** We note that under plaintiff's construction of the Declaration of Trust, no sale of property, nor any other management and legal fee-generating transaction, for that matter, could ever have been approved so long as Stamper remained a trustee; his "interest," coupled with that of the Gramlichs', would have prevented the necessary majority approval.

**48.** Defendants do not contend that they were unaware of either the aforementioned restrictions in the Declaration of Trust or the Gramlichs' indirect interest in the sales transaction.